IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AMEER MURPHY,                          :
                    Petitioner

           v.                          :        CIVIL ACTION
                                                No. 23-3970

JOHN RIVELLO, *et al*.                 :
                    Respondents
_____

## PETITIONER'S MEMORANDUM OF LAW IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS

Petitioner Ameer Murphy, by his attorney Daniel Silverman, submits this Memorandum of Law in support of his petition for writ of habeas corpus (doc. 1).

## Procedural History

On April 6, 2018, a jury presided over by the Honorable Barbara A. McDermott of the Philadelphia Court of Common Pleas found Ameer Murphy guilty of first-degree murder, conspiracy to commit first-degree murder and related weapons offenses. Judge McDermott immediately imposed the mandatory sentence of life imprisonment without parole on the murder count and concurrent terms of imprisonment on the remaining counts. Attorney George Yacoubian represented Murphy.

Murphy timely appealed. After the Superior Court was twice forced to dismiss

1

the appeal because new counsel Todd Mosser twice failed to file a brief, on October 21, 2019 a panel of the Pennsylvania Superior Court issued an unpublished opinion affirming the judgment of sentence. *Commonwealth v. Murphy*, No. 1301 EDA 2018. On March 16, 2020, the Pennsylvania Supreme Court denied discretionary review without comment. *Commonwealth v. Murphy*, No. 570 EAL 2019.  The one claim raised on direct appeal is not at issue in this federal habeas proceeding.

On June 9, 2021, Mosser filed a petition under the Post-Conviction Relief Act ("PCRA") raising one claim also not at issue in this federal habeas proceeding. Mosser labored under a conflict of interest in representing Murphy on both direct appeal and in PCRA proceedings because in PCRA proceedings Murphy had the right to allege Mosser's ineffective assistance as direct appeal counsel. On October 14, 2021, Judge McDermott dismissed the PCRA petition without a hearing. With Mosser still as counsel, Murphy timely appealed.

On October 20, 2021, a few days after Murphy's PCRA petition had been dismissed, the Pennsylvania Supreme Court issued its decision in *Commonwealth v. Aaron Bradley*, 261 A.3d 381 (Pa. 2021). *Bradley* for the first time granted PCRA petitioners like Murphy permission to allege on PCRA appeal that their PCRA counsel in Common Pleas PCRA proceedings had been ineffective in failing to identify meritorious claims. At Murphy's specific request, on April 14, 2022 Mosser filed in Superior Court a Motion for Remand under the authority of *Bradley*

requesting that new counsel be appointed to pursue two new claims that Mosser had failed to identify in the initial PCRA proceedings. Those two claims are the same two claims before this Court. Murphy had also previously alerted the Superior Court that he wished to represent himself. On April 25, 2022, the Superior Court remanded the matter to Judge McDermott, not to allow Murphy to make a record supporting his two new claims of Mosser's ineffectiveness, but rather for Judge McDermott to determine whether Murphy should represent himself. On May 31, 2022, Judge McDermott granted Mosser's request to be withdrawn and appointed new counsel Joseph Schultz to pursue new claims alleging that Mosser had been ineffective as PCRA counsel.

On June 27, 2022, Schultz filed in the Superior Court his own motion for remand invoking *Bradley* as authorization alleging Mosser's ineffectiveness in failing to identify and present these two claims. Despite the fact that the Commonwealth did not contest this motion, on July 27, 2022 a panel of the Superior Court denied the motion "without prejudice to [Murphy's] right to raise the issues in [his] brief." Schultz then filed his advocate's brief raising these two claims.

On April 21, 2023, a panel of the Pennsylvania Superior Court issued an unpublished opinion affirming the PCRA dismissal and adjudicating on the merits these two claims. *Commonwealth v. Murphy*, No. 2263 EDA 2021. This will be referred to as the "state court decision." On October 12, 2023, the Pennsylvania

3

Supreme Court denied discretionary review without comment. *Commonwealth v. Murphy*, No. 145 EAL 2023.

On October 14, 2023, Murphy filed this counseled petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254(d) (doc. 1). By order dated October 27, 2023 (doc. 5), the Court granted Murphy leave to file this supporting memorandum of law no later than January 23, 2024.

**Timeliness of this Habeas Petition**

Habeas petitioners have one year from the date judgment of sentence becomes final to file their habeas petitions.  28 U.S.C. § 2244(d)(1).  The limitations period is tolled from the date a state post-conviction petition is properly filed through and including the state post-conviction appeals period. 28 U.S.C. § 2254(d)(2).

Here, Murphy's judgment of sentence became final on August 13, 2020, 150 days after discretionary review was denied in state court on March 16, 2020.[1] He therefore had until August 12, 2021 to file this habeas petition. Yet, Murphy properly filed his PCRA petition on June 9, 2021, 64 days before the federal statute of limitations expired. The federal statute of limitations was then tolled from June 9, 2021 (when his PCRA petition was properly filed) until October 12, 2023 (when his

---

[1] In response to the Covid-19 pandemic, the United States Supreme Court gave petitioners an additional 60 days within which to file their petitions for writ of *certiorari* for any petitions that would have been due on or after March 19, 2020. See U.S. Sup. Ct. Miscellaneous Order (March 19, 2020)

state PCRA appeals were completed). Murphy then had 64 days from October 12, 2023, or until December 15, 2023, to file his federal habeas petition.  28 U.S.C. §§ 2244(d)(1) and (d)(2). Because Murphy filed his habeas petition on October 14, 2023, it is timely.

## Standards of Review

A.  Exhaustion and the Anti-Terrorism and Effective Death Penalty Act

The Anti-Terrorism and Effective Death Penalty Act ("AEDPA") provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless adjudication of the claim –
>
> (1)   resulted in a decision that was contrary to, or involved and unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). AEDPA imparts a presumption of correctness to the state court's determination of factual issues, which can only be rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the

Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). With respect to "the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. This inquiry requires the habeas court to "ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id*. at 409.  The Third Circuit Court of Appeals has noted that "an unreasonable application of federal law is different from an incorrect application of such law and a federal habeas court may not grant relief unless that court determines that a state court's incorrect or erroneous application of clearly established federal law was also unreasonable." *Werts v. Vaughn*, 228 F.3d 178, 196 (3d Cir. 2000) (citing *Williams*, 529 U.S. at 411).

With respect to the "unreasonable application" clause, a state court decision reflects an unreasonable application of clearly established federal law "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with the [Supreme] Court's precedents." *Harrison v. Richter*, 562 U.S. 86, 102 (2011); *see also Randolph v. Secretary, PA Dep't of Corrections*, 5 F.4th 362, 377-78 (3d Cir. 2021) (no fair-minded jurist would disagree that Pennsylvania state

court unreasonably applied clearly established federal law governing violations of the defendant's right to choose counsel).

Habeas relief is also warranted under § 2254(d)(2) where the state court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Failing to consider dispositive facts triggers this ground for relief under AEDPA as does a defective state-court fact-finding process. *Miller-El v. Cockrell,* 537 U.S. 322, 346 (2003) (state court fact-finding process is flawed where it ignores evidence that supports petitioner's claim); *Detrich v. Ryan*, 677 F.3d 958, 981-82 (9th Cir. 2012) (selectively citing only the incriminating aspects of expert report is error under AEDPA; "a state court unreasonably determines the facts when it 'overlook[s] or ignore[s] evidence [that is] highly probative and central to petitioner's claim'") (citation omitted).

AEDPA's deferential standards of review do not apply to claims that were not adjudicated on the merits by the state courts in the first instance. 28 U.S.C. § 2254(d) (AEDPA only applies to claims that were "adjudicated on the merits in State court proceedings)"; *Bronshtein v. Horn*, 404 F.3d 700, 710 n.4 (3d Cir. 2005) (Alito, J.) (*de novo* review is applied where claim was not adjudicated on the merits in state court); *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001) ("[W]hen, although properly preserved by the defendant, the state court has not reached the merits of a claim thereafter presented to a federal habeas court, the deferential standard . . . does not

apply."). In that situation, the federal habeas court employs *de novo* review. *Jacobs v. Horn*, 395 F.3d 92, 100 (3d Cir. 2005) ("In cases where the AEDPA standards of review do not apply, federal habeas courts apply pre-AEDPA standards of review.").

Typically, claims must also be exhausted. *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) (a state prisoner must exhaust his remedies in state court for a federal court to review the claim and grant relief). To exhaust the claim, the prisoner must invoke "one complete round of the state's established appellate review process". *Id.* at 845. He need only "fairly present" the claims in state court to preserve his right to federal review and that only requires him to bring in federal court the "substantial equivalent" of those claims presented to the state courts and alert the state court to the federal basis of the claim. *Baldwin v. Reese*, 541 U.S. 27, 32 (2004) ("A litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim "federal"); *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (*per curiam*); *Santana v. Fenton*, 685 F.2d 71, 73-74 (3d Cir. 1993).

Both claims before the Court have been exhausted and were adjudicated on the merits in the state court.

B.  Sixth Amendment Claims Alleging Ineffective Assistance of Counsel

Because both of Murphy's claims allege the ineffective assistance of trial counsel, he sets forth here the standards governing such claims.  The Sixth Amendment provides a right to the effective assistance of counsel. To prove a violation of this constitutional provision, a petitioner must prove that his counsel performed deficiently and that such substandard performance prejudiced him. *Strickland,* 466 U.S. at 687. To prove the deficient performance prong, a petitioner must show that his "counsel's representation fell below an objective standard of reasonableness" and identify the acts and omissions that were not the result of reasoned professional judgment.  *Id*. at 690.

Prejudice under *Strickland* is not an outcome-determinative test.  *Id*. at 693-94.  The question is not whether representation by effective counsel would have actually changed the verdict, nor even whether representation by effective counsel would "more likely than not" have changed the outcome.  *Id.*  Instead, prejudice is established when confidence in the outcome is undermined because of counsel's deficiencies.  *Id.* at 694.  This "undermines confidence" standard for prejudice "is not a stringent one.  It is less demanding than the preponderance standard."  *Bey v. Superintendent Greene SCI*, 856 F.3d 230, 242 (3d Cir. 2017); *Hull v. Kyler*, 190 F.3d 88, 110 (3d Cir. 1999) (internal quotation marks and citations omitted) (citing *Nix v. Whiteside*, 475 U.S. 157, 175 (1986)). *See also Jacobs v. Horn*, 395 F.3d 92,

105 (3d Cir. 2005) (prejudice under *Strickland* is not a stringent standard).   A petitioner need only show "a probability sufficient to undermine confidence in the outcome" as "*Strickland* does not set a high bar with respect to the prejudice inquiry".   *Thomas v. Varner*, 428 F.3d 491, 502 (3d Cir. 2005).   More specifically, a petitioner need only show a reasonable probability that "one juror would have harbored a reasonable doubt." *Buck v. Davis*, 580 U.S. 100, 119-20 (2017).

### Summary of Trial Testimony

Because both claims of ineffective assistance will likely require the Court to assess whether counsel's performance prejudiced Murphy, we summarize the trial testimony in some detail.   The prejudice assessment under *Strickland* requires a review of the entire record. *Williams v. Taylor*, 529 U.S. 362, 397-98 (2000) (state court prejudice determination was unreasonable under AEDPA because it failed to consider the totality of the evidence).

Leon Williams, a friend of the decedent's family, testified that on March 16, 2015 at approximately 9:50 p.m., he was on his front porch at 6053 Irving Street in the Cobbs Creek area of West Philadelphia when he saw two males following the decedent, Marquan Royster, walking eastbound on Irving Street from 61st toward 60th Street. When Royster began to run, both males shot their guns at him. Williams heard 3 to 4 shots from each gun. The shooters came back up Irving Street toward 61st Street and jumped in a red car driven by a third male and left. One shooter was

taller than the other; Williams identified Murphy as the shorter of the two. Williams did not identify Murphy in any post-incident confrontation. He identified Murphy's photograph from an array and then identified him at the preliminary hearing. [Notes of testimony, hereafter "N.T.", 4/2/18, 202-228]

Norman Gay testified that he heard gunshots while he was watching television with his wife in his home at 6052 Irving Street. He eventually stepped onto his front porch while still grasping the front door. From that vantage point he saw two men running in his direction from 60th toward 61st Street while his wife was also tugging him back into the house. He never saw either male shoot his gun. In court he identified Murphy as one of the males but when he viewed a photo array two weeks after the incident he selected the photograph of one Amir Grant, not Murphy, as one of the shooters. Each male had a gun with a laser beam. He testified that one of the males was 6'7" or 6'8" tall and the other was 6'4" or 6'5." He told police, however, that the males were 5'7" and 6' respectively. [N.T. 4/3/18, 93-152]

In the courtroom, Camden County Police Officer Jeffrey Kostoplis viewed video footage of the emergency room at Cooper Hospital on the night of the incident and identified Murphy. Officer Kostoplis testified that Murphy gave hospital staff the name of Quateer Brown and said he had been shot in the foot during a drive-by shooting at 4th and Erie Streets in Camden. There was no record of any shooting at that location that night. [*Id.* at 188-96]

Detective Thomas Gaul testified that Murphy told him that he had not been present when Royster was killed. Murphy knew Royster and heard that he had been killed in retaliation for the death of Damien James. Murphy also said that he himself had been shot in the area of 24th and Moore Streets in South Philadelphia at the same time that Royster was killed and went to Cooper Hospital to be treated. [N.T. 4/4/18, 53-58]

Detective John Verrecchio testified that Murphy told him that there was a dispute with Royster relating to the murder of Damien James. When Detective Verrecchio confronted Murphy with data from Murphy's cell phone showing that on the night in question he traveled from the area around 63rd and Walnut Streets toward the airport into South Philadelphia and across the Walt Whitman Bridge toward Cooper Hospital, Murphy said, "My life is over," "Can I just take this case myself?" and "I wasn't there either." He also explained that others pressured him to retaliate and that he and others were scared that they would be next. [*Id*. at 97-101]

Detective Thorsten Lucke testified that Murphy ran a Google search on his cell phone the day after the incident searching for news about the incident. This was the only time on that phone that anyone had ever searched for news.  [*Id*. at 149-50]

Royster died from a gunshot wound to the head. [N.T. 4/3/18, 172] Police recovered four .45 caliber and three .380 caliber fired cartridge casings (FCCs) at the scene. The .45 caliber FCCs came from the same one gun; the .380 caliber FCCs

came from the same one gun. [N.T. 4/4/18, 26-27]

Because it is relevant to the claim alleging trial counsel's failures to adequately consult with Murphy about the plea offer and to appreciate the strength of the Commonwealth's case, the Court should be aware of just how overwhelmingly unpersuasive and downright silly the defense case-in-chief was. Trial counsel first presented Laurance Shiver, who was in custody. He testified that he picked Murphy up in his car near 25th and Moore Streets on the night in question and that someone started shooting at them. This testimony was intended to explain away that Murphy sustained that gunshot wound in the very shooting he committed. Shiver was unable to explain how Murphy, who was seated in the front passenger seat, could have sustained a gunshot to his toe from a shooter who was situated on the driver's side of the car. [*Id*. at 205-06] The odds that Murphy would coincidentally suffer a gunshot wound in South Philadelphia at the same time two neutral, unbiased Commonwealth witnesses and a rash of forensic evidence placed him in a shootout in West Philadelphia are too slim to countenance.

More ludicrous was counsel's decision to present Questina Woods, Murphy's mother, to say that Murphy came home that night at about 11:00 p.m. with a gunshot wound to his foot. She explained that the reason Murphy's cell phone showed travel from the area of the shooting in the Cobbs Creek Neighborhood of West Philadelphia toward the airport and on to Cooper Hospital is because *she* had the phone and took

it with her to the area of the shooting late at night because she was planning on moving from her home at 31st and Tasker Streets in South Philadelphia and wanted to check out that neighborhood to see if it was safe for her 7- and 12-year-old children. When confronted with the fact that pornography was found on the phone, she claimed that the porn was hers. [N.T. 4/5/18, 18-31] According to her, then, she just happened to be in the same neighborhood with his cell phone at the same time her son was credibly accused of shooting someone he had a motive to harm.

Murphy repeated these story lines in his own testimony and further denied that he had confessed.  [*Id*. at 90-103]

## Claims for Relief

**I.  Trial counsel was ineffective in violation of the Sixth Amendment in failing to object to the trial court's defective instruction on accomplice liability which permitted the jury to convict Murphy of first-degree murder as an accomplice even if it found that he did not have the specific intent to kill.**

### A.  Facts

We incorporate the factual summary presented *supra* at 10-14. Most relevant to this claim is that two young men, one of whom was identified at trial as Murphy, were following the decedent when, according to witnesses, both began to shoot at him. Evidence suggested but could not prove that one shooter had a .45 caliber semi-automatic gun and the other had a .380 caliber semi-automatic gun. The decedent

died instantly from one gunshot wound to the head. No testimony was presented on which caliber bullet struck the decedent's head.

Because two assailants were involved, because it was unknown from the testimony which assailant killed the decedent, because one assailant may have harbored the specific intent to kill while the other did not, and because one assailant may have shot his gun while the other assailant did not, the trial court instructed on accomplice liability, as follows:

> So I'm going to talk to you about liability for the conduct of another person or persons, and this is referred to as accomplice liability and criminal conspiracy. You're going to get the definition of criminal conspiracy as well. There are theories of liability upon which someone may be held responsible for the actions of another. I want to talk to you about that. There are two basic ways that one defendant may be criminally responsible for conduct committed by another person or persons. . . .

[The trial court proceeded to introduce the conspiracy theory of liability]

> Now, there is a second and separate way that a defendant can be proved liable for the conduct of another person, that is when the defendant is an accomplice, someone who actually commits the crime. There is a basic difference between being an accomplice and being a conspirator. In a conspiracy, people agree to act jointly. To be an accomplice, a person does not have to agree to help someone else. The person is an accomplice if he on his own acts to help the other person commit a crime.

> More specifically, the defendant is an accomplice of another for a particular crime if the following two elements are proven beyond a reasonable doubt. The defendant had the intent to promote or facilitate the commission of that crime and the defendant solicits, commands, encourages or requests the

other person to commit it, aids, agrees to aid or attempts to aid the other person in committing the crime or plan. It is important to understand that a person is not an accomplice merely because he was present when a crime is committed or knows that a crime is being committed.

A person who is an accomplice will not be held responsible for a crime if and only if the person, before the other person commits the crime, either stops his own efforts to promote or facilitate the commission of the crime and either wholly deprives his previous efforts of effectiveness in the commission of the crime or gives timely warning to law enforcement authorities or otherwise makes a proper effort to prevent the commission of the crime.

[N.T. 4/6/18, 24-27]  The trial court then instructed on the charge of first-degree murder, as follows:

The defendant has been charged with first-degree murder. First-degree murder is a murder in which the perpetrator has the intent to kill. To find the defendant guilty of this offense, you must find that the following three elements have been proven beyond a reasonable doubt: That Marquan Royster is dead, *that the defendant or his co-defendant killed him, and that the defendant or his co-defendant has to have the specific intent to kill.*

If you would decide that the co-defendant killed Mr. Royster, and the defendant was with him, but the defendant also has to have the specific intent to kill (*sic*). He can be engaged in a conspiracy if the goal of the conspiracy was to kill Mr. Royster.

[*Id.* at 31-32 (emphasis supplied)]

At no time did the trial court instruct that in order for the jury to convict Murphy of first-degree murder as an accomplice the Commonwealth must prove

16

beyond a reasonable doubt that he shared the shooter's intent to kill. Trial counsel George Yacoubian did not lodge an objection on this ground, which allowed the jury to convict his client of first-degree murder as an accomplice of the shooter even if he lacked any specific intent to kill the decedent.

## B. The Accomplice Liability Instruction Was Defective

Under Pennsylvania law, the specific intent to kill is an element of first-degree murder. *Tyson v. Superintendent Houtzdale SCI*, 976 F.3d 382, 386 (3d Cir. 2020); *Commonwealth v. Thomas*, 194 A.3d 159, 167 (Pa. Super. 2018). A defendant may be found guilty of first-degree murder either as the principal or as an accomplice. An accomplice is guilty of first-degree murder if he promotes, solicits or facilitates the crime with the same specific intent to kill as the principal. 18 Pa.C.S. § 306(c) and (d). The Commonwealth must therefore prove that the defendant shared the shooter's intent to kill. *Tyson*, 976 F.3d at 386 ("Thus, to be guilty as an accomplice to first-degree murder, the state must prove the accused possessed the specific intent to kill"); *Everett v. Beard*, 290 F.3d 500, 513 (3d Cir. 2002) ("Pennsylvania law has clearly required that for an accomplice to be found guilty of first-degree murder, s/he must have intended that the victim be killed.") *Commonwealth v. Speight*, 854 A.2d 450, 460 (Pa. 2004).

At trial, evidence before the jury supported several different conclusions: (1) that Murphy was not involved at all;

(2) that Murphy, as principal, accomplice or co-conspirator, shot the decedent with the specific intent to kill him; and

(3) that Murphy was an accomplice of the co-defendant but did not share the co-defendant's specific intent to kill, a jury finding state law fully sanctions on these facts.

The trial court failed to instruct the jury that in order for it to convict Murphy of first-degree murder as an accomplice there must be proof beyond a reasonable doubt that Murphy shared his co-defendant's specific intent to kill. Instead, the trial court explicitly permitted the jury to convict Murphy of first-degree murder as an accomplice if *either* he *or his co-defendant* had the specific intent to kill. This allowed the jury to convict Murphy of first-degree murder if only his co-defendant possessed the requisite mental state where Murphy himself lacked it. This violates state law. *Tyson*; *Everett*; *Speight*, *supra*.

The trial court separately defined accomplice liability and first-degree murder and only mentioned the specific intent to kill in the definition of the latter. The trial court instructed the jury that it could convict Murphy of first-degree murder if his co-defendant had the specific intent to kill. The only sentence in the jury charge that could conceivably refer to the requirement that an accomplice must possess his own specific intent to kill in order to be guilty of first-degree murder is:

If you would decide that the co-defendant killed Mr. Royster,

> and the defendant was with him, but the defendant also has to
> have the specific intent to kill.

[N.T. 4/6/18, 32] This incomprehensible, severely grammatically incorrect non-sentence does not make clear that to be guilty *as an accomplice* to first-degree murder Murphy must possess the specific intent to kill. The court does not mention the word accomplice or place this (mis-)statement in the definition of accomplice liability. Instead, the court gave this instruction as part of its definition of first-degree murder. As such, it is more likely that the jury understood this phrase "the defendant also has to have the specific intent to kill as an element of first-degree murder for the principal. And merely being "with" the co-defendant does not make him an accomplice, rendering that phrase a throwaway line.

This instruction relieved the Commonwealth of its burden under the Due Process Clause of the Fourteenth Amendment to prove each element of an offense beyond a reasonable doubt. *See In re Winship*, 397 U.S. 358, 364 (1970). Lessening the prosecution's burden of proof in this way violates "[t]his bedrock, 'axiomatic and elementary' principle." *Francis v. Franklin*, 471 U.S. 307, 313 (1985) (quoting *Winship*, 397 U.S. at 363). An instruction containing some "ambiguity, inconsistency, or deficiency" that creates a "reasonable likelihood" the jury misapplied the law and relieved the government of its burden of proof violates the Due Process Clause. *Bennett v. Superintendent Graterford SCI*, 886 F.3d 268, 285

(3d Cir. 2018) (citing *Waddington v. Sarausad*, 555 U.S. 179, 190-91 (2009) (internal citations omitted)).

Pennsylvania trial courts repeatedly commit this error, its appellate courts repeatedly fail to correct it, and habeas courts in this Circuit have not hesitated to grant relief on this precise basis, on facts that are indistinguishable from those in this case. *See, e.g.*, *Bennett*, 886 F.3d at 287 ("there is 'a reasonable likelihood' that the jury found that Bennett was guilty of first degree murder because he was a conspirator and accomplice to the robbery, not because it found that he possessed the requisite specific intent.") (citations omitted); *Tyson*, 976 F.3d at 392 ("we find a strong likelihood the jury convicted Tyson as an accomplice to first-degree murder without finding he possessed the specific intent to kill. Indeed, we could find no language in the instruction that would lead the jury to connect the requisite intent to kill to the role of an accomplice."); *Smith v. Horn*, 120 F. 3d 400, 411 (3d Cir. 1997) ("A fair reading of the jury instructions given in this case permitted the jury to convict Smith of murder in the first degree without first finding beyond a reasonable doubt that Smith intended that [the victim] be killed. Portions of the instructions are ambiguous as to the requisite finding of intent."); *Simpson v. Wetzel*, 485 F.Supp. 3d 545, 565 (E.D.Pa. 2020) ("the Pennsylvania Supreme Court has continued to hold that when read as a whole, jury instructions are valid so long as specific intent for first-degree murder is properly defined somewhere in the instructions and conspiracy

or accomplice liability is properly defined elsewhere, even if the instructions are somewhat otherwise ambiguous, or verbose to the point of being impossible to discern, as to whether a conspirator or accomplice must harbor specific intent to kill") & 578 ("the instructions violate Mr. Simpson's federal due process rights because it was reasonably likely that the ambiguous vicarious liability instructions permitted a jury to convict Mr. Simpson of first degree murder as a conspirator or accomplice of a different crime."); *Baker v. Horn*, 383 F.Supp. 2d 720, 768 (E.D. Pa. 2005) ("The trial court effectively instructed the jury that it could attribute the specific intent of the actual killer to an accomplice without an independent finding of specific intent on the part of the accomplice, or, alternatively, that it need not consider the accomplice's intent at all, in contravention of Pennsylvania law, and in violation of Baker's right to due process."); *Laird v. Horn*, 159 F.Supp. 2d 58, 84 (E.D.Pa. 2001) "the jury was not specifically instructed that it needed to find that *both* defendants harbored specific intent to kill in order to convict them *both* of first degree murder. Rather, the instruction on accomplice liability was reasonably likely to lead the jury to conclude that it need only find that petitioner solicited, commanded, encouraged or requested the facilitation of *a crime* and the crime of first degree murder was committed—by either defendant."), *aff'd* 414 F.3d 419, 425-428 (3d Cir. 2005); *Fuller v. Wetzel*, 2001 WL 2004114 (E.D.Pa. April 26, 2021) (Report by Magistrate Judge Lloret recommending grant of habeas relief) at *10

(trial counsel found ineffective for failing to object to same defective instruction; "[t]he trial court did not explain that no matter the theory of liability – as principal, accomplice, or co-conspirator - the jury must find that Mr. Fuller had the specific intent to kill before the jury could convict him of first-degree murder.") (report adopted by district court after Commonwealth declined to object, 2021 WL 1998774 (E.D. Pa. May 19, 2021).

As in each of these cases, the accomplice instruction here relieved the Commonwealth of proving that Murphy possessed the specific intent to kill in order for him to be convicted as an accomplice of first-degree murder. As in each of these cases, the accomplice instruction allowed the jury to convict Murphy of first-degree murder if the co-defendant alone possessed that intent. Since the trial evidence supported the conclusion that Murphy acted as an accomplice generally but lacked the specific intent to kill, this instructional defect deprived Murphy of the available opportunity for a lesser verdict than first-degree murder and was therefore unconstitutional.

In reviewing a jury instruction for error, this Court's analysis "must focus initially on the specific language challenged." *Francis v. Franklin,* 471 U.S. 307, 315 (1985). The Court then considers the challenged language in the context of the jury charge as a whole. *Id.* (citing *Estelle v. McGuire,* 502 U.S. 62, 72 (1991); *Flamer v. Delaware,* 68 F.3d 736, 752 (3d Cir.1995). The central question is

"'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." *Estelle,* 502 U.S. at 72 (quoting *Boyde v. California,* 494 U.S. 370, 380 (1990)).

Applying these standards, the trial court's accomplice liability instruction is constitutionally infirm.

### C. Trial counsel was ineffective for failing to object to this instruction

"Generally, trial counsel's stewardship is constitutionally deficient if he or she 'neglect[s] to suggest instructions that represent the law that would be favorable to his or her client supported by reasonably persuasive authority' unless the failure is a strategic choice." *Bey v. Superintendent Greene SCI*, 856 F.3d 230, 238 (3d Cir. 2017) (quoting *Everett*, 290 F.3d at 514). Yacoubian's failure to object to the trial court's instruction allowed the jury to convict his client as an accomplice to first-degree murder without first finding that he shared the co-defendant's specific intent to kill.

Yacoubian had no strategic reason for failing to object to this defective instruction. His sworn declaration states:

> On December 4, 2023, I met with Mr. Murphy's current counsel, Daniel Silverman, in my office to discuss the case. Mr. Silverman's investigator was also present. Mr. Silverman told me that one of the claims he was raising in federal habeas proceedings related to an arguably defective jury instruction on accomplice liability. I have not reviewed that instruction. Mr.

> Silverman explained that in his view Judge McDermott failed
> to instruct the jury that in order for it convict (*sic*) Mr. Murphy
> as an accomplice to first-degree murder the jury had to find that
> he himself possessed the specific intent to kill. Assuming Mr.
> Silverman's explanation to me is accurate, and without weighing
> in on the merits of that claim, I can say that I had no strategic
> reason not to object. If the court finds that the instruction was
> in fact defective, I had no strategic reason not to object.

[*See* Declaration of George Yacoubian dated December 4, 2023, reproduced in Petitioner's Appendix of Exhibits (hereafter "Appendix") as Exhibit A, ¶3]

Nor could he have had any strategic reason to forego objecting. A correct and complete accomplice instruction that required proof of a separate intent to kill could only have benefited his client and would not have been inconsistent or irreconcilable with any defense theory of the case. Merely because Yacoubian presented an alibi defense, as weak and half-hearted as it was, does not mean that he should have sat idly by while the court allowed his client to be improperly convicted as an accomplice to first-degree murder. Since the parties' objections to the charge would have taken place out of the earshot of the jury [*see* N/.T. 1/6/18, 40], Yacoubian could have lodged his objection without any fear that it would appear to the jury that he was seeking both a complete acquittal and a compromise verdict.

His failure to take remedial action prejudiced Murphy by allowing the jury to convict him of first-degree murder where there was adequate evidence in the case from which the jury could conclude that he did not possess the specific intent to kill.

That is a major due process violation. Although we concede that the evidence of Murphy's involvement in the crime was strong (particularly when considering the exceedingly implausible defense Yacoubian presented), the evidence that he possessed the specific intent to kill was anything but. This was not a close-range firing, which might otherwise suggest an intent to kill. Murphy's alleged statements to the detective – "My life is over." "Can I just take this case myself?" -- only incriminated Murphy in the incident in general; they do not confirm that he intended to kill Mr. Royster. The state law inference of intent arising from one's use of a deadly weapon on a vital organ proves nothing about Murphy's intent because there was no proof that Murphy used a deadly weapon on a vital organ: it was never determined which of the defendants' guns shot the bullet that struck Mr. Royster's head.  The motive evidence relating to the rivalry between gangs only established that Murphy had a motive to retaliate generally, not kill specifically.  Certainly the cell-phone evidence only placed Murphy at the scene and offers nothing about his intent. Although all of this evidence was admissible on the issue of intent, it was nonetheless completely inconclusive on the issue of intent. Perhaps because of this uncertainty, the Commonwealth was willing to have Murphy plead guilty to third-degree murder and agreed to withdraw the charge of first-degree in exchange for a term-of-years sentence [*see* N.T. 1/8/18, 39], representing some evidence that the

Commonwealth itself harbored doubts that it would necessarily secure a conviction to first-degree murder on the evidence at hand.

As such, the Commonwealth cannot be heard to argue that the evidence of Murphy's guilt on the charge of first-degree murder was overwhelming, sufficient to rebut the prejudice that resulted from Yacoubian's failure to remedy the defective instruction.

### D. The State Court Decision

1. <u>Murphy exhausted this claim</u>

This claim was fairly presented to the state court on PCRA appeal pursuant to the rule of *Commonwealth v. Bradley*, 261 A.3d 381 (Pa. 2021). As *Bradley* authorizes, on April 14, 2022 initial PCRA counsel Todd Mosser filed a motion in the Pennsylvania Superior Court to remand the matter to the Court of Common Pleas so that Murphy could raise claims of trial counsel's ineffective assistance that Mosser had failed to identify. [*See* Mosser Motion for Remand, reproduced in the Appendix as Exhibit B] Mosser was prompted to file this motion by Murphy's letter to Mosser dated April 5, 2022 directing him to file that motion because Murphy wished to raise the same two claims presented in this habeas petition. [*See* letter from Murphy to Mosser dated April 5, 2022, reproduced in the Appendix as Exhibit C] That same day Murphy also sent a letter to the Superior Court prothonotary enclosing his letter to Mosser and asking the court to honor his request to file these

claims under the authority of *Bradley*. [*See* letter from Murphy to Superior Court dated April 5, 2022, reproduced in the Appendix as Exhibit D] Exhibits B, C and D are part of the existing state court record and Exhibits B and C were in fact cited in the Superior Court's opinion denying relief. [*See* state court opinion at *8-9]  The court never acted on Mosser's April 14, 2022 motion for remand.

On June 27, 2022, new PCRA appellate counsel Joseph Schultz filed in the Superior Court his own motion for remand under the authority of *Bradley* raising the same two claims now before this Court. [*See* Schultz Motion for Remand, reproduced in the Appendix as Exhibit E] By order dated July 27, 2022, the Superior Court denied the motion "without prejudice to Appellant's right to raise the issues in the application before the panel of this Court assigned to decide the merits of the appeal by either refiling the application in writing once the case has been assigned to a panel or by raising the issues in the Appellant's brief." [*See* Superior Court order of July 27, 2022 and appellate docket (entry for July 27, 2022), reproduced in the Appendix as collective Exhibit F]

In accordance with the Superior Court's order, Schultz included these two claims in his principal brief, couching each of them, for procedural reasons only, as claims alleging Mosser's ineffective assistance in failing to identify them. As to this claim, Schultz repeatedly alerted the state court to its federal constitutional basis, citing (a) the Sixth Amendment and *Strickland v. Washington*, 466 U.S. 668 (1984)

for the ineffective assistance aspect of the claim and (b) the Fourteenth Amendment Due Process Clause and several of the leading Third Circuit cases, which themselves cite clearly established United States Supreme Court cases addressing these same facts and applying the Fourteenth Amendment, for the underlying substantive due process violation.  [*See* principal Brief for Appellant, pages 8, 18-23]

This claim is therefore exhausted.

## 2. In the alternative, *Martinez v. Ryan* excuses the default

As a technical matter, one could argue that Murphy only exhausted the discrete claim that PCRA counsel was ineffective for failing to identify the claim that trial counsel was ineffective for failing to object to this defective, prejudicial instruction. Since there is no federal constitutional right to the effective assistance of post-conviction counsel, the argument goes, that particular claim is non-cognizable in federal habeas. In the event the Court is persuaded by this reading of the posture of this claim, Murphy argues in the alternative that initial PCRA counsel Mosser's ineffective assistance in failing to identify the separate claim that trial counsel was ineffective for failing to object to this instruction serves as cause to excuse Murphy's default in failing to exhaust the underlying trial counsel ineffectiveness claim.

The general rule is that a state prisoner must exhaust his remedies in state court in order for a federal court to review the claim and grant relief. *O'Sullivan,* 526 U.S.

at 842 (1999). In order to have a defaulted claim considered in federal court habeas proceedings, the petitioner is permitted to show that he can excuse the default. Where the petitioner can show "cause" for the default and "prejudice" resulting from the federal violation, the default is excused. *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991); *Wenger v. Frank*, 266 F.3d 223, 224 (3d Cir. 2001). A petitioner satisfies the cause and prejudice test by showing that "some objective factor external to the defense impeded . . . efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Slutzger v. Johnson*, 393 F.3d 373, 381 (3d Cir. 2004) (quoting same).  Here, Murphy meets this standard regarding this arguably defaulted claim because of initial PCRA counsel's failure to preserve it.

Historically, initial PCRA counsel's ineffective assistance had not satisfied the "cause" prong to excuse a procedural default because there is no federal constitutional right to counsel in post-conviction proceedings to begin with. *Coleman*, 501 U.S. at 752. In *Martinez v. Ryan,* 566 U.S. 1 (2012), however, the United States Supreme Court expanded the law on what constitutes cause to excuse a default, holding that the ineffective assistance of initial-review state post-conviction counsel may now constitute cause to excuse the procedural default and allow a substantial cognizable federal claim to be heard in federal habeas despite state counsel's having failed to preserve it. The ineffective assistance of post-conviction counsel itself is not the federal claim for relief; it is only the cause that

excuses the procedural default. The federal claim for relief remains the underlying constitutional claim.

To satisfy *Martinez*, Murphy must show that (1) the default was caused by ineffective counsel on post-conviction review; (2) counsel's ineffectiveness occurred in the first collateral proceeding when the defaulted claim could have been raised; and (3) the defaulted claim is substantial. *Richardson v. Superintendent Coal Township SCI*, 905 F.3d 750, 762 (3d Cir. 2018) (citing *Martinez*, 566 U.S. at 14; *Cox v. Horn*, 757 F.3d 113, 119 (3d Cir. 2014)). To satisfy the first prong of this test, Murphy must show that PCRA counsel's performance was deficient under *Strickland*. *Richardson*, 905 F.3d at 762 (citing *Preston v. Superintendent Graterford SCI*, 902 F.3d 365, 375 (3d Cir. 2018)). Murphy does not need to independently demonstrate that PCRA counsel's deficient performance caused prejudice because prejudice automatically exists if the defaulted claim is substantial. *Richardson*, 905 F.3d at 764 (citing *Workman v. Superintendent Albion SCI*, 903 F.3d 368, 376-79 (3d Cir. 2018)).

A claim is substantial if it possesses "some merit." *Workman,* 915 F.3d 928, 937 (3d Cir. 2019) (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)). To demonstrate that his claim has some merit, Murphy need only meet the standard for securing a certificate of appealability: that reasonable jurists could debate whether (or, for that matter, agree) that the claims have merit or that the merits of the claims

were adequate to deserve encouragement to proceed further. *Preston,* 902 F.3d at 377.

Assuming this Court finds that Murphy has established cause under *Martinez* and prejudice to excuse the default, the Court must address the merits of the underlying trial counsel ineffectiveness claim. Assuming this Court finds that the underlying trial counsel ineffectiveness claim itself was not adjudicated on the merits in state court, it is not subject to AEDPA's deferential standards of review. 28 U.S.C. 2254(d). In that scenario, there is simply no state court adjudication for this Court to review. Instead, this Court's review is *de novo*. *Bronshtein, supra; Appel, supra.*

But, in truth, the state court did adjudicate the underlying claim on its merits in finding that the instruction was not defective and therefore Yacoubian had not been ineffective. Because the state court's merits adjudication allows this Court to have before it the full benefit of the state court reasoning, this Court should find that Murphy exhausted the underlying trial counsel ineffectiveness claim.

3. *Shinn v. Ramirez* does not block consideration of Yacoubian's declaration

Murphy did everything state law allowed him to do to preserve and litigate this claim. Had the Superior Court remanded the matter, as *Bradley* contemplates, Murphy could have introduced into the state court record all evidence supporting his claim. This would have included a declaration from Yacoubian setting forth his

position that he had no strategic reason for not objecting to the defective accomplice instruction. *Bradley* specifically instructs that "where there are material facts at issue concerning claims challenging counsel's stewardship and relief is not plainly unavailable as a matter of law, the remand should be afforded[.]" *Bradley*, 261 A.3d at 402 (citation omitted). *See also Commonwealth v. Parrish*, 273 A.3d 989, 1002 (Pa. 2022) (remand under *Bradley* needed where material facts are in dispute on claims alleging ineffectiveness). Any deficiency in the existing record, then, is solely the result of the Superior Court's refusal to allow Murphy to make a complete record in support of this claim. Because Murphy displayed no lack of diligence in this regard, *Shinn v. Ramirez* does not prevent federal court consideration of the new evidence presented here, specifically Yacoubian's declaration confirming that he had no strategic reason for not objecting.

4. <u>The state court decision unreasonably applied clearly established federal law</u>

This claim was adjudicated on the merits, triggering the deferential provisions of 28 U.S.C. § 2254(d). Although the state court did not cite or discuss *Strickland* and its two-pronged test, a careful reading of its analysis of this claim in the context of its explication of the test for analyzing ineffective assistance of counsel claims presented earlier in the opinion adequately suggests that the court identified the applicable law and proper standards governing a *Strickland* claim. But, as we discuss below, because *Strickland*'s deficient performance prong requires Murphy to show

that this accomplice instruction relieved the prosecution of its heavy burden to prove all elements of accomplice liability for first-degree murder beyond a reasonable doubt, because Murphy proved that, and because the state court failed to identify that principle or the cases like *In re Winship*, 397 U.S. 358 (1970) that require such proof, the court's decision failing to reach that issue unreasonably applied clearly established federal law.

Moreover, the state court failed to apply the clearly established Supreme Court law of *Francis v. Franklin*, 471 U.S. 307 (1985) and *Sandstrom v. Montana*, 442 U.S. 510 (1979) invalidating a jury charge that contains both an incorrect statement of the law followed by a correct statement where the court fails to renounce the incorrect statement. This, too, is fatal to its *Strickland* analysis.

The state court's discussion of the deficient performance prong of this *Strickland* claim is reprinted here in its entirety:

> In Appellant's second issue, he raises a layered ineffectiveness claim based on Trial Counsel's failure to object to the trial court's purportedly "defective" jury instruction on accomplice liability. *See* Appellant's Brief at 17-23; *see also id*. at 22 ("Because it is unknown which shooter fired the fatal shots, it is exceedingly likely that the jury convicted [Appellant] as an accomplice, believing that it did not matter who fired the fatal shots.").
>
> Where a party challenges the propriety of a jury instruction, an appellate Court must review
>
>> the relevant portion of the trial court's charge in context, as a whole, and mindful of the trial court's broad discretion

in phrasing jury instructions as well as the principle that unless a particular instruction is fundamentally erroneous or would have 'misled or confused the jury' no relief is due.

***Commonwealth v. Simpson***, 66 A.3d 253, 268 (Pa. 2013) (citation omitted). Simply put, "an appellate court must consider the charge in its entirety, rather than discrete portions of the instruction." ***Commonwealth v. Montalvo***, 244 A.3d 359, 368 (Pa. 2021). "The trial court has broad discretion in phrasing the charge and the instruction will not be found in error if, taken as a whole, it adequately and accurately set (*sic*) forth the applicable law." ***Commonwealth v. Daniels***, 963 A.2d 409, 430 (Pa. 2009). "Where an instruction is alleged to be ambiguous, the standard of review is whether there is a reasonable likelihood that the jury applied it in a manner that violates the Constitution." ***Commonwealth v. Markman***, 916 A.2d 586, 613 (Pa. 2007).

Appellant assails the following statement by the trial court in instructing the jury that

the defendant is an accomplice of another for a particular crime if the following two elements are proven beyond a reasonable doubt. The defendant had the intent to promote or facilitate the commission of that crime and the defendant solicits, commands, encourages, or requests the other person to commit it, aids, agrees to aid or attempts to aid the other person in committing the crime or plan.

N.T., 4/6/18, at 26; ***see also*** Appellant's Brief at 17.

According to Appellant, it "is likely the jury convicted [Appellant] with an improper jury instruction." Appellant's Brief at 23. Appellant claims, "[w]ithout advising the jury about the 'specific intent to kill' requirement, the instant jury could have wrongly concluded that just 'bringing about the death' of the victim as an accomplice was sufficient for first-degree murder." ***Id***. at 18; ***see also id***. at 20 ("Instead of the standard instruction, the trial court should have offered the jury the accomplice liability instruction for first-degree murder."). Appellant further argues

34

the trial court's instruction was vague and undefined.
The court informed the jury that for accomplice liability,
the jury must find that [Appellant] had the 'intent to
promote of facilitate the commission of *that crime*.
N.T. 4/06/18, at 26 (emphasis added). 'That crime,'
however, was undefined. [Appellant] was charged
with multiple crimes.

**Id**. at 18.

Conversely, the Commonwealth states:

[Appellant] cannot show prejudice because the jury
could not have convicted him based on a faulty theory
of accomplice liability. The evidence of [Appellant's]
role as the principal killer was overwhelming, and the
record conclusively established [Appellant's] specific
intent to kill.

Indeed, [Appellant] interposed an alibi defense – *i.e.*,
He defended not on the basis that he may have been
involved but did not intend to kill, but on the basis that
he was not present or involved in the incident at all.
The evidence starkly proved otherwise.

Commonwealth Brief at 18 (italics in original).

Appellant concedes "the trial court later instructed the jury on the
*mens rea* for first-degree murder and that first-degree murder requires
a specific intent to kill…." Appellant's Brief at 19; *see also* N.T.,
4/6/18 at 30-33. Further, our review discloses that the challenged
jury instruction, viewed as a whole, was not so 'fundamentally
erroneous' as to have 'misled or confused the jury[.]' ***Simpson,
supra***; ***see also Daniels***, 963 A.2d at 432 ("Considering the
instructions in their entirety, and not an excerpt in isolation,
it is apparent that the trial court instructed the jury on accomplice
liability consistent with this Court's case law."). Thus, there is
no reasonable likelihood that the jury applied the jury instruction
"in a manner that violates the Constitution." ***Markman, supra***.

[State court opinion at *20-23 (all capitalization, italics, boldface, bracketing, and omitting of citations in the original)] Considering the trial court's charge as a whole and in context, and giving due deference to the broad discretion trial judges have in phrasing their instructions, it is nonetheless beyond debate that the trial court here never instructed the jury that to convict Murphy as an accomplice to first-degree murder, the jury must find beyond a reasonable doubt that he independently possessed a fully formed specific intent to kill.

The state court devoted all but two sentences of its analysis on the deficient performance prong to merely recounting the general principles applicable to claims alleging instructional defects and the parties' contentions. The only reasoning supporting its decision on the performance prong comprises nothing more than the following:

(1) in a part of its charge separate from the instruction on accomplice liability the trial court instructed the jury that first-degree murder generally requires specific intent to kill (which Murphy has always conceded);

(2) the conclusory statement that the instruction was not "so fundamentally erroneous" as to have misled or confused the jury; and

(3) the conclusory statement that there was therefore no reasonable likelihood that the jury misapplied the jury instruction.

As we previously briefed, state law requires proof that a jury may only convict an accomplice to first-degree murder where there is proof he himself possessed the specific intent to kill. The trial court failed to so instruct and in fact affirmatively allowed Murphy to be convicted of first-degree murder if his co-defendant had the intent to kill but Murphy did not.  This violates the clearly established federal law that any instruction relieving the prosecution of its heavy burden to prove each element of the offense is unconstitutional. The state court did not identify or discuss this controlling principle of law or the cases from which it comes – perhaps because it failed to even identify the actual language under challenge in the accomplice instruction that was given. Where the state court fails to apply the *Winship* requirement for proof on each element of the offense to a *Strickland* claim alleging counsel's failure to object on that basis, its decision unreasonably applies *Strickland* to the facts of this case.  All of the Court of Appeals and District Court cases, both pre-AEDPA and post-AEDPA, decided in the Third Circuit granting habeas relief on this same claim, cited *supra* at 20-22, point up the unreasonableness of the state court's analysis here. Yacoubian clearly performed deficiently in failing to object to an accomplice instruction that has consistently been condemned, and no amount of state appellate conclusory statements or reliance on the general standards for addressing instructional claims changes that.

The state court failed to even identify or discuss either the affirmatively defective language of the first-degree murder instruction or the omission in its accomplice liability instruction requiring Murphy to possess the intent to kill. What the trial court got affirmatively wrong was its instruction that:

> To find the defendant guilty of [first-degree murder], you must find that the following three elements have been proven beyond a reasonable doubt: That Marquan Royster is dead, *that the defendant or his co-defendant killed him, and that the defendant or his co-defendant has to have the specific intent to kill.*

This allowed the jury to convict Murphy of first-degree murder if only his co-defendant possessed the intent to kill. What the trial court got wrong in its accomplice instruction was its failure to require the jury to find Murphy also possessed the intent to kill. The only language that remotely tried to state the law correctly was:

> If you would decide that the co-defendant killed Mr. Royster, and the defendant was with him, but the defendant also has to have the specific intent to kill.

Assuming all twelve jurors understood this garbled phrasing as a requirement for proof that Murphy possess the specific intent to kill in order to establish accomplice liability in a first-degree murder case, the court nonetheless failed to identify and then disavow its prior mistakes allowing Murphy to be convicted as an accomplice

despite the absence of an intent to kill. Where a judge gives both a correct and an incorrect statement of the law, and fails to correct the misstatement, there is no way for a reviewing court to know which instruction the jury followed. *Francis v. Franklin*, 471 U.S. 307, 315 (1985); *Whitney v. Horn*, 280 F.3d 240, 256 (3d Cir. 2002) (reversal still required where instruction contains a "constitutional flaw" despite presence of other correct statements of the law). The state court failed to address any of this in its *Strickland* analysis when it was required to in order to determine whether Yacoubian should have objected.

5. The state court's prejudice analysis applied a standard contrary to *Strickland* and was also based on an unreasonable determination of the facts

The state court's discussion of the prejudice prong of this *Strickland* claim is reprinted here in its entirety:

> Even if the trial court had erred in instructing the jury on accomplice liability, the error would be harmless. The Pennsylvania Supreme Court has explained:
>
> > The harmless error doctrine[2], as adopted in Pennsylvania, reflects the reality that the accused is entitled to a fair trial, not

---

[2] The harmless error doctrine does not apply to *Strickland* claims, so the state court's reliance on it is misplaced. For constitutional violations (typically raised on direct appeal) other than those alleging ineffective assistance of counsel, relief may be denied if the prosecution can prove that the error was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18 (1967); *Commonwealth v. Story*, 383 A.2d 155 (Pa. 1978). *Strickland* claims require the defendant to prove prejudice, that there is a reasonable probability that if counsel had not performed deficiently the result would have been different. They are not interchangeable terms.

a perfect trial. We have described the proper analysis as follows:

> Harmless error exists if the record demonstrates
> either: (1) the error did not prejudice the defendant
> or the prejudice was *de minimis*; or (2) the erroneously
> admitted evidence was merely cumulative or other
> untainted evidence which was substantially similar
> to the erroneously admitted evidence; or (3) the
> properly admitted and uncontradicted evidence
> of guilt was so overwhelming and the prejudicial
> effect of the error was so insignificant by comparison
> that the error could not have contributed to the verdict.

*Commonwealth v. Hairston*, 84 A.3d 657, 671-72 (Pa. 2014)
(citations omitted); *see also Commonwealth v. Noel*, 104 A.3d
1156, 1169 (Pa. 2014) ("If a trial error does not deprive the
defendant of the fundamentals of a fair trial, his conviction will
not be reversed." (citation omitted)).

Any prejudice from the trial court's jury instruction would have
been *de minimis*, as the uncontradicted evidence of [Appellant's]
guilt was so overwhelming and the prejudicial effect of the error
was so insignificant by comparison that the error could not have
contributed to the verdict." *Hairston*, 84 A.3d at 672. In deciding
Appellant's direct appeal, this Court concluded that the
Commonwealth presented overwhelming evidence of Appellant's
guilt. We explained:

> Both Williams and []Gay identified Appellant as the
> Shooter at trial and in earlier statements to police. The
> prosecution presented records from a phone that was at
> the location of the shooting at the time it had occurred.
> The phone contained selfies of Appellant and text
> messages sent from "Meer Meer" a few hours before
> the shooting occurred. N.T., 4/4/18, at 144-45.

> The phone's geolocation records also showed the
> phone was brought back to Appellant's home after
> the shooting and eventually taken to a Camden
> hospital, where Appellant admittedly checked in

with a gunshot wound to the foot. Appellant gave
a fake name to the Camden medical personnel[] and
indicated he had been shot in Camden. However,
Camden police found no evidence of a shooting in
the area Appellant reported. When confronted with
his phone records, Appellant exclaimed [to police]
that his "life [was] over" and indicated that he would
take responsibility for the murder if no one else was
prosecuted. N.T., 4/4/18, at 97.

Moreover, the Commonwealth presented evidence that
would allow the jury to infer that Appellant had a motive
to kill the [decedent]; Appellant admitted the [decedent]
was a member of a rival gang who was suspected to have
murdered Appellant's best friend.

*Murphy*, 222 A.3d 847 (unpublished memorandum at 14-15).

Consistent with the foregoing, Appellant's second ineffectiveness
issue fails. *See Commonwealth v. Bishop*, 936 A.2d 1136, 1140
(Pa. Super. 2007) (stating where "evidence of guilt is
overwhelming, counsel's purported ineffectiveness fails the
prejudice prong") (citation omitted). Accordingly, we affirm the
PCRA court's dismissal of Appellant's first PCRA petition.

[State court opinion at *23-25 (all capitalization, italics, boldface, bracketing, and

omitting of citations in the original)] This prejudice analysis is both an unreasonable

application of clearly established federal law under 28 U.S.C. § 2254(d)(1) and

based on an unreasonable determination of the facts as presented in the state court

proceeding under 28 U.S.C. § 2254(d)(2).

The state court assessed prejudice from Yacoubian's failure to object to the

accomplice instruction using the wrong standard. *Strickland* set the standard at

whether there is a reasonable probability of a different verdict, 466 U.S. at 695. This means that a petitioner need only show a reasonable probability one juror would have declined to convict, as a mistrial caused by a deadlocked jury represents a "different" verdict. *Buck v. Davis*, 580 U.S. 100, 119-20 (2017) (petitioner need only show a reasonable probability that "one juror would have harbored a reasonable doubt."); *Haskins v. Superintendent Greene SCI*, 755 Fed. Appx. 184, 189 (3d Cir. 2018) (conviction on reduced charges or a hung jury represents a different result; state court's failure to appreciate that was contrary to clearly established federal law). With specific reference to the issue in this case, then, Murphy need only show a reasonable probability one juror would have declined to convict him of *first-degree murder* had Yacoubian secured a proper instruction on that very issue.

Instead of applying the correct prejudice standard, the state court characterized this error as "*de minimis*," one that "could not have contributed to the verdict," without assessing whether there was a reasonable probability one juror would have voted differently *on the charge of first-degree murder* had the court properly instructed on accomplice liability for first-degree murder. That is contrary to *Strickland*. Murphy is not arguing that there were instructional defects that affected the jury's deliberations as a whole; the only relevant issue is whether the defective accomplice liability instruction affected the jury's deliberations on the charge of first-degree murder. Therefore, the state court's recounting of the "overwhelming

evidence" that implicated Murphy in criminal conduct generally is not relevant on the issue of whether Yacoubian's failure to remedy the instructional error prejudiced Murphy's right to a fair determination of his guilt as an accomplice to first-degree murder. This it surely did. We are talking about a deeply flawed instruction, not on some tangential issue, but on the *mens rea* element of the very theory of liability for the most serious criminal charge under Pennsylvania law.

The state court's failure to distinguish between the overwhelming evidence of Murphy's involvement in the crime generally and the insubstantial evidence of Murphy's specific intent to kill specifically also rendered its decision one that was based on an unreasonable determination of the facts under § 2254(d)(2). Failing to consider dispositive facts triggers this ground for relief under AEDPA. *Miller-El v. Cockrell,* 537 U.S. 322, 346 (2003) (state court fact-finding process is flawed where it ignores evidence that supports petitioner's claim); *Detrich v. Ryan*, 677 F.3d 958, 981-82 (9th Cir. 2012) (selectively citing only the incriminating aspects of expert report is error under AEDPA; "a state court unreasonably determines the facts when it 'overlook[s] or ignore[s] evidence [that is] highly probative and central to petitioner's claim'") (citation omitted). Here, the state court ignored all the facts that supported the conclusion that there was not strong evidence that Murphy harbored the specific intent to kill; instead it just lumped together all the facts that showed Murphy participated in the incident generally and then, in typical conclusory

fashion, broadcast that this overwhelming evidence of guilt generally refuted any suggestion that it was reasonably probable one juror might have voted differently if only the trial court had given a proper instruction on accomplice liability.

Of all the facts the state court listed to support its prejudice analysis, only one comes anywhere close to showing Murphy's intent was to kill. Murphy told one detective that he had heard that Mr. Royster had been killed in retaliation for the killing of Murphy's close friend, Damien James [N.T. 4/4/18, 53-54] and Murphy told another detective that there had been an on-going dispute over the killing of Mr. James. [*Id*. at 97] Every other fact the state court relied on, and every other fact in the state court record, only proves that Murphy was involved in this incident generally. [*See* discussion *supra* at 25-26 on how the Commonwealth's evidence only established Murphy's guilt on murder generally not first-degree murder specifically] Under § 2254(d)(2), the state court's decision failed to consider the dispositive facts showing that the evidence of Murphy's intent to kill was anything but strong.

When a state court rushes through its analysis on an instructional claim by completely disregarding the challenged defect in the charge, and then reaches its no-prejudice conclusion by ignoring the critical distinction between the petitioner's involvement in the crime generally and his specific involvement in the only crime at

issue in the federal proceeding, the habeas court has a role to play under both §§ 2254(d)(1) and (2).

## II. Trial counsel was ineffective in violation of the Sixth Amendment in failing to adequately consult with and provide competent advice to Murphy regarding the Commonwealth's plea offer.

> If a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it.
>
> --*Lafler v. Cooper*, 566 U.S. 156, 165 (2012)

### A.  Facts

Murphy was arrested on April 1, 2015 and held without bail. Yacoubian entered his appearance on or about June 20, 2016. Trial commenced on April 2, 2018, three full years after Murphy was first charged.

The first time the Commonwealth extended a plea offer to Murphy was on January 8, 2018, when the Commonwealth offered a recommended total sentence of 25 to 50 years' imprisonment in exchange for a guilty plea to third-degree murder, conspiracy, and possession of a prohibited firearm.  [N.T. 1/8/18, 13, 15 (Yacoubian confirms that as of that moment there had yet to be a plea offer made); 39 (prosecutor advises trial judge of the terms of the plea offer with Murphy present in the courtroom)] After deciding on January 8, 2018 to continue the trial to April 2, 2018, Judge McDermott offered Yacoubian the choice of conducting a plea-rejection

colloquy of his client on that day, moments after the plea offer was made, or on April 2, 2018, when trial was scheduled to start. [*Id*. at 32] Yacoubian immediately told the court that the colloquy could proceed right then, which Judge McDermott proceeded to do. [*Id*.] The transcript of those day's proceedings does not reflect when, where or for how long Yacoubian spoke with Murphy about the plea offer, extended for the first time that day, or what advice if any Yacoubian provided.

For his part, Yacoubian recalls nothing in these regards. [*See* Exhibit A, ¶2 ("I do not have clear recollections about much of this case.") and ¶5 ("I do not recall specifically speaking with Mr. Murphy about the pros and cons of pleading guilty generally or accepting the Commonwealth's plea offer.")] He could not even remember whether he told his client that the evidence against him was overwhelming. [*Id*. at ¶4] Yacoubian could only offer the vague outlines of what his "practice" would have been in discussing with his client the pros and cons of pleading guilty.

Murphy, however, recalls the precise details of his discussions with Yacoubian. In his sworn declaration, he states:

> 2. I first met attorney George Yacoubian at the county jail sometime in the late spring or early summer of 2016. This was before I hired him to represent me on my homicide case. Even though we barely spoke about the facts of my case in that first meeting (or ever), he told me that I had a really strong case and he would not allow me to take a plea deal for anything other than "single digits." That meeting lasted less than 15 minutes. I agreed to hire him and

arranged to give him a down payment of $6,500 on his $10,000 fee soon after that meeting. I now know that he was just bragging about how good a lawyer he would be for me just to get me to hire him.

3. Between then and my April 2018 trial, Mr. Yacoubian and I met about four more times at the county jail. On each occasion we never discussed the facts of my case or the defense strategy. He always had me called down to the attorney/client visiting room when he was at the prison to visit other clients. He never came to see me to prepare or go over the case. He would say that he was "just checking in" to see how I was doing and that everything was fine with him getting ready for the case. One time I brought the discovery with me to go over with him and he said something like, "There's no need for that. I'm just here to make sure you're doing OK." Every meeting after that first meeting lasted no more than 5 minutes.

4. In December 2017, he visited me just like all the other times.  In this meeting he told me that he had run into the prosecutor on my case and had a short conversation about a possible plea deal. He told me that he asked the prosecutor to "throw a number" at him and the prosecutor had asked him to "throw a number" back at him. Mr. Yacoubian told me that he told the prosecutor that he should go first. He told me that the prosecutor informally suggested a plea deal for 22 ½ to 45 years for third-degree murder. Mr. Yacoubian then asked me, "What do you think of 22 ½ to 45?"  I told him that he previously told me that he wasn't going to let me plead to anything other than "single digits" and that he has had the case for two-and-a-half years during which I had assumed he was preparing for trial. Of course the 22 ½ year deal sounded wrong. He dropped the subject at that point and just said that he was passing that message along. This was the last time I met with him in the county jail before my trial started five months later. That was the entire content of the conversation about the plea offer.

5. At no time during any of these meetings at the jail did he and I discuss anything at all related to pleading guilty other than (a) his one comment before I hired him that he would not allow me to plead to anything more than "single digits" and (b) relating to me the informal conversation he had with the prosecutor. At

no time in these meetings or at any other time did he go over with me what the chances were that I would be convicted.

6. On January 8, 2018, I was in court before Judge McDermott for the beginning of my trial My grandmother, mother and sister were present in the courtroom. Judge McDermott was angry that the assigned prosecutor had been fired a few days earlier and that the case would have to be delayed. At some point there was a discussion about getting the Commonwealth to make me a plea offer. Shortly after, while I was still seated at the defense table, Mr. Yacoubian told me that the prosecutor had made an offer of 25 to 50 years. In a conversation that lasted no more than two minutes while we were seated in court with the prosecutor a few feet away and the judge on the bench in a courtroom full of the victim's family members Mr. Yacoubian asked me, "Do you want to take it?" I asked him, "What happened to the 22 ½ to 45?" He said that that was only an unofficial discussion and that number was not on the table. He said, "Do you want it or not?" I said "No," and that was the end of that conversation. I was mad that the case was being continued after three years of me locked up waiting for something to happen on my case. I was mad that my family was forced to come down to court for no reason. I was mad that it seemed like the DA was playing with me by changing the terms of the plea offer. And I didn't know what to think about Mr. Yacoubian coming at me with a plea offer at the last second and just asking me whether I wanted it. Nothing seemed right.

7. With the benefit of the years that have passed, I can now better see that the evidence against me was strong and I should have taken the deal. I didn't know then what I know now, because Mr. Yacoubian never spent any time explaining things to me. I was only 20 when this happened and 22 when the DA offered me a deal for 25 to 50 years. 25 years was more years than I had been alive. It seemed like such a high number to someone that young. I believe there is a good chance I would have taken the deal if only Mr. Yacoubian had taken just a little time to explain to me that this was a good deal for me given how likely it was that I'd be convicted of first-degree murder, get a life sentence and die in jail. He never spoke to any of my family members either (although I do understand he sexually assaulted my sister).

[*See* Declaration of Ameer Murphy dated December 12, 2023, reproduced in the Appendix as Exhibit G, ¶¶2-7]

Murphy's family members confirm that Yacoubian was not all that committed to a vigorous defense of his client. Despite many contacts with Murphy's grandmother, Robin Reed, and mother, Questina Woods, Yacoubian never related to them that the Commonwealth was offering a plea deal or even discussed with them the possibility that a plea deal might be in their loved one's best interests. He therefore made no efforts to enlist their help, if any was even needed, to persuade Murphy to consider pleading guilty generally or accepting the Commonwealth's plea offer specifically.   [*See* Declaration of Robin Reed dated December 2, 2023 reproduced in the Appendix as Exhibit H, ¶2 and Declaration of Questina Woods dated December 1, 2023, reproduced in the Appendix as Exhibit I, ¶3] Reed confirms that she would have strongly encouraged Murphy to take the 25-year deal and Woods would have gladly done so if only Yacoubian had reached out to them. [*Id*.]

Both women also confirm how unprofessional and unprepared Yacoubian was. Woods testified at trial to help corroborate Murphy's alibi and explain away why Murphy's cell phone was in the immediate area of the shooting when it occurred. Despite her importance to the defense, Yacoubian never once prepared her to testify and did not even notify her that she would be testifying until sometime in the midst of the trial itself. [Exhibit I, ¶2] Had Yacoubian bothered to commit just a

little time and effort to interviewing Woods before deciding to call her as a witness, he would have learned that the pornography on the phone did not belong to her and that the texts on the phone were obviously written by Murphy, two pieces of Commonwealth evidence that shredded Woods's credibility. A lawyer who lacks the commitment to prepare for trial is a lawyer who may well lack the commitment to effectively consult with a client regarding the plea offer.

Yacoubian's focus was more on Murphy's sister, Ayanna Woods (hereafter "Ayanna") than it was on representing Murphy.  Instead of discussing with Murphy's family how unlikely it was that, given the strength of the Commonwealth's evidence, Murphy would be convicted of first-degree murder and be sentenced to life without parole, Yacoubian devoted his attention on securing Ayanna's phone number and making plans to see her socially. [*See* Declaration of Ayanna Woods dated April 3, 2022, reproduced in the Appendix as Exhibit J, ¶2; Exhibit H, ¶3 ("During the times Mr. Yacoubian came to my house to get money, he was mostly interested in my granddaughter Ayanna. I saw him speaking to her outside my house. I know she went out with him once or twice, until she told me she did not like him and did not want to see him again.")] After exchanging phone numbers and making social arrangements, he picked Ayanna up for what was ostensibly a date. [Exhibit I, ¶¶2-3] A lawyer who would so cavalierly violate his ethical obligation to avoid conflicts of interest arising from dating the sister of an

existing client is a lawyer who might well cavalierly violate his duty to zealously advocate his client's legal interests by taking the time to establish rapport with the client and consult effectively about the need for him to accept the Commonwealth's plea offer.

On that social date, Yacoubian, a man in his mid-fifties, immediately drove the 19-year-old Ayanna to some location in the Manayunk section of Philadelphia (where he does not live) and proceeded to sexually assault her. [*Id.*] Yacoubian admitted that he may have exchanged phone numbers with the family but denied the remainder of Ayanna's allegations. [*See* Investigation Report of Allen Investigative Group dated December 13, 2023, reproduced in the Appendix as Exhibit K, page 5] After Yacoubian heard these allegations, the investigator noted: "In responding, it was this investigator's impression that Yacoubian turned red. . . ." [*Id.*] This suggests that Yacoubian was covering up his criminal conduct.  A 50-something lawyer who would falsely deny sexually assaulting a 19-year-old young woman is a lawyer who might not hesitate to falsely claim that his practice is to assiduously consult with all his criminal clients about the wisdom of accepting a favorable plea deal and that he must have followed that practice in Murphy's case.

Recently, Yacoubian expressed his belief that the evidence of his former client's guilt was extremely strong. [Exhibit A, ¶4 ("In my professional judgment, the evidence of Mr. Murphy's guilt on all charges was overwhelming."); Exhibit K,

page 4 ("Yacoubian fully agreed with Silverman's statement that the evidence of Ameer's guilt was really strong and that the defense they put on was not believable, was a joke, and was not going to work."); *see also* email exchange between Yacoubian and PCRA appeal counsel Chris Campbell and Joseph Schultz, reproduced in the Appendix as Exhibit L in which Yacoubian failed to answer almost all of counsel's questions and said, "There was overwhelming evidence of his guilt.")] This assessment proves that the plea offer of 25 years was the far more reasonable course of action and, at least in hindsight, Yacoubian recognized this.

Yet, Yacoubian never visited his client in county custody to discuss this plea offer. Prison visitation records prove that Yacoubian's last visit with Murphy was on December 18, 2017 (confirming Murphy's declaration), which was three weeks *before* the plea offer was even made, at the January 8, 2018 court listing. [*See* Philadelphia Prison System visitation log, reproduced in the Appendix as Exhibit M] The first and only time Yacoubian discussed with Murphy the Commonwealth's plea offer was on January 8, 2018 – either in the courtroom on the very day trial was to begin, with many others present (as Murphy swears) or in the anteroom adjacent to the courtroom (as Yacoubian, who could not recall anything about this case, surmised would have been the likely place for this discussion). In either event, Murphy and his family came to court believing trial was to begin that day, and it appears that Yacoubian and Judge McDermott were also under that impression. A

short chat during a break in the action, with an angry judge waiting on the bench, a frustrated client, and a lawyer who by his own admission did not strongly encourage Murphy to accept the plea offer, were not circumstances conducive to a thoughtful, meaningful and legally effective consultation between counsel and his 22-year-old client designed to encourage him to suddenly switch tactics, forego the trial he was ready to start that morning, and agree to a 25-year prison term.

Yacoubian's cavalier approach to this important decision is made clear by his refusal of the judge's invitation to take some time – specifically the three months before the new trial date – to discuss the matter further with his client and only then report back to her on Murphy's decision whether to accept the Commonwealth's offer.  [N.T. 1/8/18, 32] This would have given Yacoubian the necessary time to properly and effectively discuss this vital question with his client. It would have provided the opportunity to enlist family help to convince Murphy – if convincing was even necessary – to accept the plea offer.  Yacoubian could not explain why he declined the judge's offer. [Exhibit K, page 4 ("[Yacoubian] could offer no reason why he did not take those extra months to try to convince Ameer to accept the offer.")]

### B. This Claim Is Exhausted

As with the previous claim, Murphy complied with the procedures set forth in *Commonwealth v. Aaron Bradley*, 261 A.3d 381 (Pa. 2021), and exhausted this claim

on PCRA appeal to the Superior Court (hereafter "the state court"). [*See* Brief for Appellant on PCRA appeal, at 9-17] Murphy fairly presented to the state court the federal constitutional basis for relief by citing and discussing the Sixth Amendment right to the effective assistance of counsel and the seminal United States Supreme Court cases of *Strickland v. Washington*, *Lafler v. Cooper*, and *Missouri v. Frye* that govern counsel's duties at the plea-bargaining stage of the trial process. [*Id. passim*] Instead of remanding the matter to allow Murphy to compile and present a complete factual record to support this weighty claim, as *Bradley* explicitly authorizes and as Murphy requested, the state court panel decided that it had before it an adequate record on which to deny relief. [State court opinion at *11-12 ("our review of the record reveals that it is 'sufficient to allow for disposition of [Appellant's] newly [] raised ineffectiveness claims.' ") (brackets in original) (citation omitted)]

As with the previous claim (*see* discussion *supra* at 28-31), even assuming Murphy only exhausted the distinct claim that PCRA counsel was ineffective for failing to identify the claim that trial counsel was ineffective for failing to adequately consult with Murphy regarding the plea offer, *Martinez* again excuses his default. Murphy similarly meets the *Richardson* test, notably that Mosser was ineffective for failing to identify this substantial claim.

And as with the previous claim, the state court did adjudicate the underlying claim on its merits in finding that the plea colloquy by itself defeated the claim that

Yacoubian had not been ineffective. Because the state court's merits adjudication allows this Court to have before it the full benefit of the state court reasoning, this Court should find that Murphy exhausted the underlying trial counsel ineffectiveness claim.

### C.  *Shinn v. Ramirez* **does not preclude an evidentiary hearing**

*Bradley* specifically instructs that "where there are material facts at issue concerning claims challenging counsel's stewardship and relief is not plainly unavailable as a matter of law, the remand should be afforded[.]" *Bradley*, 261 A.3d at 402 (citation omitted). *See also Commonwealth v. Parrish*, 273 A.3d 989, 1002 (Pa. 2022) (remand under *Bradley* needed where material facts are in dispute on claims alleging ineffectiveness). In state court Murphy requested a remand in order to create the record needed to support this claim that he diligently pursued in accordance with this established state procedure. The Superior Court was not the proper forum for Murphy to have presented all the facts, documents and witness declarations to secure that remand, and nothing in *Bradley* or any other Pennsylvania case required him to do so. Pennsylvania appellate courts, like all appellate courts, are not equipped to receive and consider new evidence in the first instance; that is a quintessential function of trial-level courts. Marshalling that evidence and converting it into proper pleading format impose an improper burden on appellate counsel, particularly since strict appellate briefing schedules do not contemplate

such labor-intensive tasks.   It is because of this that *Bradley* and *Parrish* dictate that a remand is necessary where material facts are in dispute. Here, Murphy alleged facts supporting a serious ineffective assistance claim. The Commonwealth disputed those factual allegations in its own brief on appeal. State law required that the matter be remanded to adjudicate those disputed facts.

Instead, the Superior Court acted rashly in denying the remand, figuring it could resolve this claim solely on the basis of the plea-rejection colloquy conducted minutes after the plea offer was first made and seconds after Yacoubian met briefly with Murphy to discuss it.  Yet plea colloquies are not only not dispositive of this claim, as the state court erroneously and unreasonably found, they are nearly completely irrelevant, because a defendant's one-word responses to a judge's questions under the circumstances presented here are only as informed as the advice counsel provided him.

And we now know that the advice Yacoubian gave Murphy was next to nothing. Yacoubian never visited Murphy in jail to discuss the plea offer. According to Murphy -- which Yacoubian does not dispute since he cannot recall anything about this case -- Yacoubian devoted very little time, while seated in the courtroom itself, explaining why this plea offer was Murphy's only legitimate shot at a favorable result, given how strong the evidence was. Yacoubian should have done

so much more, as we explain below, to secure for his client the benefits represented by this plea deal.

The Supreme Court acknowledges that colloquies like this are beside the point in the analysis whether plea counsel was ineffective.  "An inquiry into whether the rejection of a plea is knowing and voluntary, however, is not the correct means by which to address a claim of ineffective assistance of counsel." *Lafler v. Cooper*, 566 U.S. 156, 174 (2012) (citing *Hill v. Lockhart*, 474 U.S. 52, 57 (1985)). Only a particularly courageous, self-assured and knowledgeable criminal defendant would feel comfortable suddenly stopping the proceedings at that point to proclaim that "come to think of it" the lawyer had done nothing in this regard. Few people in Murphy's position would risk displeasing the one lawyer (and possibly the trial judge) in whose hands his future lies by asserting his own displeasure with the lawyer's conduct.  This colloquy does nothing except confirm what we concede – Yacoubian did nothing more than broach with Murphy the topic of pleading guilty.

And such a colloquy has the same legal effect – which is to say none -- as one of those stickers a commercial parking lot affixes to the wall saying "We are not responsible for any lost valuables." Erecting such a warning does not serve as a shield of liability against a civil action if the parking lot attendant was negligent; the owner puts up those signs in the hopes his patrons will conclude they cannot sue because of the sign. The same applies here: Many judges conduct these colloquies

in the hopes defendants like Murphy conclude that they too are without remedy.

They are not. And lawyers in Yacoubian's position fail to assert attorney/client

privilege to block such colloquies in the hopes their clients' answers shield them

from challenges to their effectiveness as plea counsel. They do not. Waiving

attorney/client privilege to complete a colloquy like this only helps the lawyer; it

does not advance the client's legal interests, which lawyers are duty-bound to

protect.[3]

---

[3] Scholars (and future Third Circuit judges) also recognize the irrelevance of such colloquies:

> The key to plea bargaining is not the plea colloquy, but the
> bargaining and advice that precede it. . . ."[I]t is the responsibility
> of defense counsel" – not the court at a plea colloquy – "to
> inform a defendant of the advantages and disadvantages
> of a plea agreement." [(quoting *Libretti*, 516 U.S. at 50)]
> Defense lawyers, not judges, investigate cases and defendants'
> particular circumstances before pleas. Defense lawyers, not
> judges, offer their clients opinions and strategic advice. The
> market system relies on lawyers' professional sense of the
> going rates. Defendants are often poor and uneducated and
> may not even speak English. They often have poor or erroneous
> information and rely on experts to correct them. The old caveat
> emptor approach is woefully inadequate for defendants navigating
> the intricacies and inequities of modern plea bargaining. As the Court
> recognized, defendants must not be "left to the mercies of
> incompetent counsel."

Stephanos Bibos, *Regulating the Plea-Bargaining Market: From Caveat Emptor to Consumer Protection*, 99 Cal.L.Rev. 1117, 1142-43 (2011) (citing *Padilla v. Kentucky*, 559 U.S. 359, 374) (2010) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970).

The state court's unreasonable refusal to allow Murphy the opportunity to make his case is the only reason the existing state court record does not contain the new evidence we have produced here.   Because Murphy displayed no lack of diligence in this regard, *Shinn v. Ramirez* does not preclude an evidentiary hearing or prevent federal court consideration of the following:

> **Exhibit A** - Yacoubian's declaration confirming his lack of recall of this case, his judgment that the evidence of guilt was strong, that he could not remember how aggressive he was in advising Murphy to accept the plea deal, and that he did not enlist Murphy's relatives to convince him to take the offer;
>
> **Exhibit G** - Murphy's declaration detailing Yacoubian's failures to consult with him regarding the plea offer and establishing a reasonable probability that he would have accepted the plea deal if only Yacoubian had performed effectively;
>
> **Exhibit H** – Reed's declaration confirming that Yacoubian never mentioned the plea offer, that she would have strongly encouraged Murphy to take it had she known about it, that Murphy complained about Yacoubian's lack of contact, and that Yacoubian focused his interest more on Murphy's teenaged sister than on his professional obligations;
>
> **Exhibit I** – Questina Woods's declaration corroborating Reed;
>
> **Exhibit J** – Ayanna Woods's declaration alleging Yacoubian sexually assaulted her;
>
> **Exhibit K** – Investigator's Report confirming Yacoubian's judgment that the evidence of guilt was strong but that Murphy thought he "would walk", that Yacoubian could not recall how aggressive he was persuading Murphy to accept the plea offer, that he could not recall any reason not to have accepted the judge's invitation for him to take more time to discuss the plea offer with his client,

and that Yacoubian turned red when confronted with the allegation that he sexually assaulted Ayanna Woods; and

**Exhibit M** – Prison Visitor Log confirming that the last time Yacoubian visited Murphy was December 18, 2017, before the Commonwealth made its plea offer.

### D. The constitutional violation

1.  Fundamental principles of law

The importance of the plea bargaining process cannot be underestimated. "[C]riminal justice today is for the most part a system of pleas, not a system of trials." *Lafler*, 566 U.S. at 170. "In today's criminal justice system . . . the negotiation of a plea bargain, rather than the unfolding of a trial, is almost always the critical point for a defendant." *Frye*, 566 U.S. at 144.  In the state court system, 94% of criminal cases are resolved by guilty plea. *Lafler*, 566 U.S. at 170. In Pennsylvania state court only 1.11% of cases result in jury trials.[4]

The need for competent plea counsel is thus critical and the Supreme Court has made clear that the Sixth Amendment right to the effective assistance of counsel applies to the plea-bargaining stage. *Frye*, 566 U.S. at 144 (constitutional right to counsel extends to the plea-bargaining process); *Lafler*, 566 U.S. at 165 ("The constitutional guarantee applies to critical pre-trial stages that are part of the whole

---

[4] https://www.pewresearch.org/fact-tank/2019/06/11/only-2%-of-federal-criminal-defendants-go-to-trial-and-most-who-do-are-found-guilty/.

course of a criminal proceeding, a proceeding in which defendants cannot be presumed to make critical decisions without counsel's advice.").

> [C]riminal defendants require effective counsel during plea negotiations. "Anything less . . . might deny a defendant 'effective representation by counsel at the only stage when legal aid and advice would help him.'"

*Frye*, 566 U.S. at 144 (cites for quotations omitted).

*Strickland*'s two-pronged test applies in assessing whether plea counsel[5] rendered ineffective assistance. Erroneous, incomplete or non-existent advice by plea counsel can all make out the deficient performance prong. *Padilla*, 559 U.S. 370 (ineffective assistance in the plea process can be found in non-advice as much as mistaken advice, equating acts of commission with acts of omission); *Strickland*, 466 U.S. at 690 ("A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment.").

Where plea counsel fails to provide the client with adequate, meaningful advice that meets the prevailing professional norms and thereby deprives the client of the information he or she needs to make an informed decision, counsel performs

---

[5] We use the term "plea counsel" to refer to Yacoubian -- even though there was no plea -- because this claim challenges his effectiveness in his pre-trial capacity, a time when his conduct regarding the propriety of a guilty plea mattered.

deficiently. *Shotts v. Wetzel*, 724 F.3d 364, 376 (3d Cir. 2013) ("In the context of a guilty plea, counsel is required to give a defendant information sufficient to 'make a reasonably informed decision whether to accept a plea offer.'") (quoting *United v. Day*, 969 F.2d 39, 43 (3d Cir. 1992)).  In determining what the prevailing professional norms were at the time, it is appropriate to consider applicable standards promulgated by the American Bar Association and similar guideposts. *Strickland*, 466 U.S. at 688. *See also Padilla*, 559 U.S. at 366 ("We long have recognized that 'prevailing norms of practice as reflected in American Bar Association Standards and the like . . . are guides to determining what is reasonable' "); *Bobby v. Van Hook*, 558 U.S. 4, 7-8 (2009) (*per curiam*); *Florida v. Nixon*, 543 U.S. 175, 191 & n.6 (2004); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (in determining deficient performance, the relevant norms of professional conduct include local practices, as well as the ABA Guidelines).

To establish prejudice in a situation where, as here, the defendant rejects the plea offer and is convicted at the ensuing trial, the "defendant must show the outcome of the plea process would have been different with competent advice." *Lafler*, 566 U.S. at 163; *see also Shotts*, 724 F.3d at 375 (prejudice at the plea stage is measured by whether counsel's deficient performance "affected the outcome of the plea process") (quoting *Hill v. Lockhart*, 474 U.S. 52, 58 (1985)).  The petitioner must also "show[] that but for counsel's deficient performance there is a reasonable

probability he and the trial court would have accepted the guilty plea." *Lafler*, 566 U.S. at 174; *see also Frye*, 566 U.S. at 147 ("Defendants must also demonstrate a reasonable probability the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it.").

Where, as here, a defendant rejects the plea offer because counsel was ineffective, and receives a higher, mandatory sentence at trial, the remedy is to require the prosecution to re-offer the plea proposal. *Lafler*, 566 U.S. at 171.

We now apply these principles to this case.

## 2. Deficient performance

Rule 1.4(b) of the Pennsylvania Rules of Professional Conduct states: "A lawyer shall explain a matter to the extent necessary to permit the client to make informed decisions regarding the representation." The Comment to the Rule states: "The client should have sufficient information to participate intelligently in decisions concerning the objectives of the representation." This basic duty applies to conveying and explaining a plea offer. *Frye*, 566 U.S. at 145 (citing with approval ABA Standards for Criminal Justice, Pleas of Guilty 14-3.2(a) (3d ed. 1999) (defense counsel must "promptly communicate and explain to the defendant all plea offers."); *Lafler*, 566 U.S. at 168 ("If a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it."); *Libretti v. United States*, 516 U.S. 29, 50 (1995) ("[I]t is the responsibility of defense

counsel to inform a defendant of the advantages and disadvantages of a plea agreement."); Bibos, *supra* at 1140 ("to make bargaining just, defendants need information to evaluate bargained-for sentences") (article cited with approval in *Lafler*, 566 U.S. at 168).

The ABA Standards also direct that counsel has a duty to interview the client as often as necessary to develop rapport and trust which are essential to represent the client effectively. *See, e.g.*, Standard 4-3.3(b) ("Counsel should interview the client as many times as necessary for effective representation, which in all but the most simple and routine cases will mean more than once. Defense counsel should make every reasonable effort to meet in person with the client. Consultation with the client regarding available options, immediately necessary decisions, and next steps, should be a part of every meeting.")

The ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, while technically only applicable to capital cases, are equally forceful and illustrative on the critical need to establish trust between counsel and client in order to effectively consult about whether to plead guilty. Guideline 10.10.5.A states that "[c]ounsel at all stages of the case should make every appropriate effort to establish a relationship of trust with the client, and should maintain contact with the client." Guideline 10.5.C underscores that such contact is necessary for any attempt to resolve the case via a guilty plea: "Counsel at all stages

should engage in a continuing interactive dialogue with client concerning . . . 1. The factual investigation . . .; 3. The development of a defense theory; . . . 5. Potential agreed-upon dispositions of the case." Guideline 10.9.1, titled "The duty to seek an agreed-upon disposition," states: (A) Counsel at every stage of the case have an obligation to take all steps that may be appropriate in the exercise of professional judgment . . . to achieve an agreed-upon disposition."

Notably, Guideline 10.19.1(E) states that "a client's . . . opposition should not prevent counsel from engaging in an on-going effort to persuade the client to accept an offer of resolution that is in the client's best interest." Murphy never opposed the idea of pleading guilty. There is no evidence he was obstructionist or a difficult client. If prevailing professional norms impose a duty to engage in on-going discussions with the client about the idea of pleading guilty when the client opposes the idea, the duty is even stronger when the client does not oppose the idea. At a minimum, this basic principle teaches that counsel should never take the client's first "no" as the final answer. *See* Kevin M. Doyle, *Heart of the Deal: Ten Suggestions for Plea Bargaining*, THE CHAMPION, Nov. 1999, §4 ("Do Not Take a Client's Uninformed 'No' for an Answer").

Consequently, the case law, Rules of Professional Conduct, professional standards announced by the ABA and supporting legal literature set the prevailing professional norm at what is only common sense: A lawyer must meet with her

client, in-person and more than once, and develop some rapport as a basis for trust, in order to discharge her duty of competent representation in a first-degree murder case and effectively explain the contours of a favorable plea offer.

Convincing the 22-year-old Murphy to agree to spend the next 25 years of his life in jail was never going to happen as the result of one brief conversation, either inside or outside the actual courtroom filled with people expecting trial to begin, with the judge on the bench, immediately after the plea offer was communicated with a lawyer who Murphy had little reason to trust was looking out for his best interests.  It bears no citation to know that a young defendant hardened on the streets of Philadelphia and locked up for years on a serious murder charge is not going to simply accede to such a lengthy prison sentence without some meaningful, evidence-based, well-presented and well-considered explanations that such a recommendation is sound.[6]  Those must include some demonstration that the lawyer has investigated

---

[6] The oft-cited science on how the 22-year-old brain is not fully developed, engendering a cockeyed capacity to assess and appreciate risk, also should have led Yacoubian to spend more time with Murphy carefully explaining the complex ins and outs of what he faced. *See Miller v. Alabama,* 567 U.S. 460, 471 (2012) (mandatory life sentences for children are unconstitutional); *Graham v. Florida,* 560 U.S. 48, 68 (2010) (life sentences for children convicted of non-homicides are unconstitutional); and *Roper v. Simmons*, 543 U.S. 551, 573 (2005) (death penalty for children is unconstitutional). Even though Murphy was 22 at the time, and therefore not a child under the law, the science the Supreme Court relied on in these seminal cases proved that the brain is not fully developed until age 25. *Miller, Graham* and *Roper* had all been decided before Yacoubian began representing Murphy.

the case and considered all available theories of defense and whether to file certain pre-trial motions. It cannot be done without having first interviewed the client, discussed with him the pre-trial discovery, and learned at least a little about the client's background and social history. Rushing the one and only consultation on the merits of the plea offer, foisted upon the defendant when he was expecting trial to begin, is bound to cause distrust, *see* Doyle, *supra*, at §9 ("If you are in a rush, forget it. You'll only confirm what your client suspects: that you don't care, that you want the plea to save you work, not to save his life.") and provoke a "blind, impulsive or stubborn decision." *Id*. at §4.  Barriers of race, class and education all impede the development of the working relationship necessary for the client to trust the lawyer's advice to plead guilty. Here, Yacoubian is a white lawyer from Radnor with several post-graduate degrees, Murphy a Black high school-educated youngster from inner-city Southwest Philadelphia.  "Overcoming these barriers takes patience above all else." Russell Stetler, *Counsel's Duty to Seek and Negotiate a Disposition in Capital Cases*, 31 HOFSTRA L. REV. 1157, 1162 (2003).[7]

---

[7] *See also* Steven Zeidman, *To Plead or Not to Plead: Effective Assistance and Client-Centered Counseling*, 39 B.C. L. REV. 841, 909 (1998) (the prevalence of mental impairment, drug and alcohol use and addiction, lack of education, and experience within the criminal justice system impair clients' abilities "to make a decision of this magnitude without the guidance and input of counsel.").

Although devoting only a short few minutes discussing the plea offer in or adjacent to the courtroom on the day trial was set to begin was Yacoubian's major failure here, it was not the only one. Effective representation would also have included (1) multiple visits and calls with Murphy before the January 2018 trial date and then again between January 8 and the April 2018 commencement of trial to convince Murphy that pleading guilty was far and away his best option, (2) enlisting the aid of family members to convince Murphy that the plea offer was his best option, and (3) meaningfully confronting Murphy with the evidence against him with effective advice on the cold reality that the chances for acquittal were slim to nil. *See, e.g., Johnson v. United States*, 860 F.Supp. 2d 663, 782 (N.D. Iowa, 2012) (condemning trial counsel's failures to spend more time with defendant discussing plea options, do more to confront defendant with evidence why a guilty plea was best option, and enlist family members to help convince defendant why plea was best option). Finally, Yacoubian failed to conduct any mitigation investigation to gather evidence that could be presented to the Commonwealth in support of a more favorable plea offer.

Yacoubian's performance respecting this plea offer was far below prevailing professional norms. When a lawyer represents a client who cannot win at trial, the lawyer must pull out the stops to ensure the client does not go to trial. The only thing this record shows that Yacoubian did was have one brief day-of-trial conversation,

with no effort to try any further to convince his client to plead. Yacoubian's shameful, going-through-the-motions-and-collect-my-check approach to advocacy here resulted in Murphy losing half his life.

Murphy has thus established the deficient performance prong of *Strickland*.

3. Prejudice

To establish prejudice under these facts, Murphy must show a reasonable probability that "the outcome of the plea process would have been different with competent advice." *Lafler*, 566 U.S. at 163; *Shotts*, 724 F.3d at 375. This requires Murphy to "show[] that but for counsel's deficient performance there is a reasonable probability he and the trial court would have accepted the guilty plea." *Lafler*, 566 U.S. at 174; *Frye*, 566 U.S. at 147. Murphy meets both of these requirements.

Had Murphy accepted the plea offer, he would have served 25 years' imprisonment; by rejecting the offer he is serving a life sentence without parole. The outcome therefore would have been different and far more favorable had Murphy pled guilty.

The only factual questions arguably in dispute are whether there is a reasonable probability that (1) Murphy would have agreed to plead guilty if Yacoubian had performed competently and (2) Judge McDermott would have accepted the plea agreement.

We can never know for sure what Murphy would have done if Yacoubian had properly advised him, which is perhaps why the law only requires him to show a reasonable probability he would have accepted the offer. Several facts support that conclusion. First, as we previously cited, in the American state court system approximately 95% of criminal cases are resolved by guilty plea. It is the extremely rare defendant who rejects a tendered plea offer and elects a trial. Those numbers, by themselves, strongly predict that Murphy also would have followed suit and not been one of the uttermost outliers.

Second, there is no evidence in this record to remotely suggest that Murphy was some hard-headed, interventionist client who was insisting on his day in court or somehow wanted to direct the trial strategy. Despite the fact that his lawyer never discussed anything substantive with him during the 22 months he represented him, Murphy did not complain one time about that (except to his grandmother) when he would have been well within his rights to do so. He did not lodge a grievance with the trial court and he never complained while the case was on appeal. During the trial itself, Murphy was the model of compliance. He never asserted himself to complain about Yacoubian's trial performance even though he failed to prepare the testimony of defense witness Questina Woods and only informed her she would be a witness in the midst of trial. These facts militate in favor of a finding that Murphy

would have followed his attorney's recommendation if only it had been effectively presented to him.

Third, Murphy's only other criminal case at the time of this trial was one where he pled guilty for a short county sentence. [*See Commonwealth v. Murphy*, CP 51 CR 0002550-2014] He was new to the criminal justice system and unsophisticated in the ways of its operations. His lack of criminal sophistication is consistent with someone who, if properly counseled, would have followed his lawyer's advice – just like he did on that previous case.

Fourth, the record proves that Murphy was willing to consider pleading guilty as a general matter, and the evidence was such that any reasonable defendant would have been open to that result. For one, Murphy pled guilty on his only other criminal case, so he presumably understood the benefits of doing so as a general proposition. He also questioned Yacoubian about why the plea offer ended up being 25 years when Yacoubian had previously told Murphy it was 22 ½ years. [Exhibit G ¶6] This suggests that Murphy was not some delusional client, somehow over-confident about his chances of an acquittal. His willingness to plead generally reflects a willingness to accept responsibility generally, an important factor in the Court's determination whether Murphy would have accepted the plea offer if only if had been effectively presented. *Lafler*, 566 U.S. at 171-72 (in the prejudice analysis,

courts should consider defendant's "expressed willingness, or unwillingness, to accept responsibility for his or her actions").

Fifth, Murphy swears in his declaration that if he had been provided accurate and complete information about the actual, case-specific risks of going to trial – how a jury would view his admissions to detectives, the lies he told at the hospital in Camden to explain away how he himself had been shot, the positive identifications by two disinterested eyewitnesses, the silly story his mother would tell, as some examples – he would have seriously considered accepting the plea offer. [Exhibit G, ¶7] And Yacoubian himself does not forcefully dispute this.

Sixth, Murphy's mother and grandmother confirm that they would have pressed Murphy to take the deal if only Yacoubian had told them about it. [Exhibits H, ¶2; I, ¶3] His mother surely knew that her proposed testimony was a lie and would have been conflicted about proffering it, a dilemma easily solved via acceptance of the plea offer.

Finally, the plea offer of 25 years was routine in a case like this. Judge McDermott advised Murphy that this offer was "in the range that the Commonwealth will offer to someone given your age and their ability to believe that in 25 years, you can change…" [N.T. 1/8/18, 39] Yacoubian does not say that he balked at the offer or communicated to Murphy that it struck Yacoubian as high or aberrational. Had Yacoubian spent a little time explaining that and enlisting others to convince Murphy

72

of that, the record suggests a reasonable probability he would have been persuaded to accept it.

It is also reasonably probable that Judge McDermott would have accepted this plea agreement. The very fact that 95% of state criminal cases result in a plea deal *a fortiori* proves that judges seldom reject negotiated dispositions of the cases before them. There is nothing in this record to suggest Judge McDermott would have rejected the deal and, according to the January 8, 2018 transcript, much to conclude that she would have approved it. She spent substantial time explaining to Murphy the risks he ran by going to trial, including that a conviction for first-degree murder would result in him leaving prison "in a pine box." [*Id*. at 33] She told Murphy that if he accepted the offer he would eligible to be released at age 45, which is "a lot younger than a lot of people in this courtroom" and that "there's been plenty of people . . . who served 60, 70 years in prison before they died." [N.T. 4/2/18, 9] She warned him that his chances of winning an appeal after trial were "not good." [*Id*. at 12] She warned him not to listen to other inmates who might be encouraging him to elect a trial. [*Id*. at 13] She told him that if he did do something wrong she does not want to send him to jail for the rest of his life, which is what will happen if he is convicted. [*Id*. at 14] She shared with him her experience as a defense attorney receiving letters from her former clients who did not heed her advice to plead guilty who now regret their decisions, saying to her that they "should have listened" to her

because they would "be out by now." [*Id.* at 15] She went so far as to explain that state law allows him to adjudicate his other open case, his violation of probation, and this murder case in one consolidated proceeding before her while asking her to impose a sentence on those two other open matters to run concurrently with the 25-50 year sentence contemplated by the plea offer. [N.T. 1/8/18, 40] One reads Judge McDermott's statements as proper encouragement that Murphy strongly consider taking this deal, which establishes more than a reasonable probability that she would have accepted its terms.[8]

### E. The state court decision

This claim was adjudicated on the merits, so the deferential provisions of 28 U.S.C. § 2254(d) apply.

1. <u>The state court's reasoning unreasonably applied clearly established federal law</u>

After properly identifying *Strickland* as the governing law, reciting the parties' positions, and quoting extensively from Judge McDermott's two colloquies

---

[8] Any argument is misplaced which seeks to substitute Judge McDermott's well-intentioned admonitions to Murphy for the thoughtful, effective advocacy Yacoubian was duty-bound to provide. Murphy had the right to advice from his lawyer, the professional with whom he was supposed to have a working relationship. Murphy had no relationship with Judge McDermott and would have naturally been skeptical that she had his best interests at heart (even though she did). For the same reason, the state court should not have relied on Judge McDermott's colloquies to resolve whether Yacoubian provided effective assistance.

of Murphy, much of which the court highlighted, the state court set forth its entire

legal analysis in one paragraph comprising three conclusory sentences:

> The exchanges between the trial court and [Murphy] belie
> Murphy's claim of Trial Counsel's ineffectiveness. Murphy
> has failed to prove he would have accepted the Commonwealth's
> plea offer if Trial Counsel had advised him differently. As Trial
> Counsel was not ineffective, [Murphy's] layered claim of PCRA
> Counsel's ineffectiveness fails.

[State court opinion at *20 (capitalization in original; citations omitted)]

The state court's reasoning relied exclusively on the plea colloquy to resolve

this ineffective assistance claim. It found that Murphy did not prove prejudice simply

because of responses he gave to Judge McDermott's questions without allowing

Murphy the opportunity to prove what Yacoubian did wrong and why *those* errors

did prejudice Murphy, despite the terse responses he gave at the colloquy. Acting

prematurely, it relied on nothing more than Murphy's generalized response that

Yacoubian consulted with him about the plea offer and offered him his

recommendation (whatever that was) without affording him the opportunity, as was

his right, to show that Yacoubian failed miserably at consulting with him and that

had counsel consulted properly about the plea offer there was in fact a reasonable

probability he would have accepted the deal.

This resulted in a decision that was an unreasonable application of the clearly

established federal law of *Lafler* and several preceding Supreme Court cases which

hold, consistent with *Strickland*, that the plea colloquy does *not* control whether counsel provided effective assistance in the plea context. *Lafler* and its progeny, consistent with *Strickland*, require inquiry into whether counsel's deficient performance prejudiced the defendant, not – as the state court reasoned – whether defendant's responses during a plea colloquy prove that he was prejudiced. By limiting its prejudice analysis solely to the colloquy, and refusing to consider how Yacoubian's failures to adequately consult with Murphy prejudiced Murphy, the state court's reasoning unreasonably applied clearly established federal law. All of this was caused by the state court's improper refusal to remand the matter for the taking of evidence to prove the claim.

In *Lafler*, 566 U.S. at 174, the Supreme Court held that "[a]n inquiry into whether the rejection of a plea is knowing and voluntary, however, is not the correct means by which to address a claim of ineffective assistance of counsel." Other cases underscore this principle. In *Libretti v. United States*, 516 U.S. 29, 50 (1995), the Court instructed that "it is the responsibility of defense counsel to inform a defendant of the advantages and disadvantages of a plea agreement," not the trial court, as occurred here. This necessarily means that confronting an allegation that counsel failed in this regard requires inquiry into whether counsel's deficient performance prejudiced the defendant, not whether the defendant responds during a colloquy that counsel discharged his obligations. If "[a] failure by counsel to provide advice may

form the basis of a claim of ineffective assistance of counsel," *United States v. Broce*, 488 U.S. 563, 574 (1989), then a plea colloquy by itself does not resolve the legal question: *Strickland* requires an examination of whether counsel's deficient performance prejudiced the defendant. Similarly, in *Hill v. Lockhart*, 474 U.S. 52, 57 (1985), the Court held that *Strickland*'s two-pronged test controls whether counsel was ineffective in the plea context, which necessarily means that a court confronting such a claim must assess whether prejudice resulted *from counsel's deficient performance*, not, as the state court found, whether the defendant's answers during a plea colloquy prove prejudice. In *McMann v. Richardson*, 397 U.S. 759, 771 (1970), the Court held that the validity of a plea depends on whether counsel's advice "was within the range of competence demanded of attorneys in criminal cases," not on whether the defendant *tells the judge* that counsel explained the plea to him and he then decided to reject it, as the state court found.

In *United States v. Cronic*, 466 U.S. 648 (1984), decided the same day as *Strickland*, the Court explained that it is error to resolve an ineffectiveness claim by relying on what the defendant says:

> Thus, the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such. If counsel is a reasonably effective advocate, he meets constitutional standards irrespective of his client's evaluation of his performance. *See Jones v. Barnes*, 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983); *Morris v. Slappy*, 461 U.S. 1, 103 S.Ct. 1610, 75 L.Ed.2d 610

> (1983). It is for this reason that we attach no weight to
> either respondent's expression of satisfaction with counsel's
> performance at the time of his trial, or to his later expression
> of dissatisfaction.

*Id*. at 657. Although *Strickland* permits the state court to resolve this claim solely on

the prejudice prong, Strickland requires the state court to nonetheless address

whether there was a reasonable probability that Yacoubian's deficient performance

prejudiced Murphy, not whether Murphy himself responded, "Yes" when asked

whether Yacoubian explained things to him. This is particularly true because

Murphy's responses to Judge McDermott's questions are a reliable measure of the

facts only if Yacoubian performed effectively in providing the advice and counsel

needed for Murphy to make an informed decision.

For these reasons, the state court's adjudication of this claim resulted in a

decision that unreasonably applied this clearly established federal law under 28

U.S.C. § 2254(d)(1). No "fairminded jurist[] could disagree that the state court's

decision conflicts with the [Supreme] Court's precedents." *Harrison v. Richter*, 562

U.S. 86, 102 (2011); *see also Randolph v. Secretary, PA Dep't of Corrections*, 5

F.4th 362, 377-78 (3d Cir. 2021) (no fair-minded jurist would disagree that

Pennsylvania state court unreasonably applied clearly established federal law

governing violations of the defendant's right to choose counsel).

2. <u>The state court's decision was based on an unreasonable determination of the facts</u>

By preventing Murphy from proving his claim and thus reaching a result in the absence of a complete record, the state court based its decision on an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(2).

When the state fact-finding process itself is defective, resulting in unreasonable determinations of material facts, § 2254(d)(2) affords the opportunity for habeas relief.  For example, where the state court refuses to give the defendant the chance to present his evidence or makes evidentiary findings without holding a hearing, this constitutes an "unreasonable determination" of the facts. *Hurles v. Ryan*, 752 F.3d 768, 790 (9th Cir. 2014) ("We have held repeatedly that where a state court makes factual findings without an evidentiary hearing or other opportunity for the petitioner to present evidence, 'the fact-finding process itself is deficient' and not entitled to deference); *Lambert v. Blackwell*, 387 F.3d 210, 239 (3d Cir. 2004) ("the extent to which a state court provides a 'full and fair hearing' . . . might be a consideration while applying deference under § 2254(d)(2)").  Also, ignoring or overlooking material evidence before it renders the state court decision unreasonable. *Miller-El v. Cockrell*, 537 U.S. 322, 346 (2003); *Detrich v. Ryan*, 677 F.3d 958, 981 (9th Cir. 2012).

As the Third Circuit stated, a federal court has the "rudimentary responsibility to ensure that it is deciding a constitutional claim based on factual findings that were

forged in a procedurally adequate way and were anchored in a sufficient evidentiary record." *Fahy v. Horn*, 516 F.3d 169, 182-83 (3d Cir. 2008). The state court here did not determine the facts from an adequate record. Rather, it short-circuited the entire fact-finding process by making dispositive findings of fact – appellate findings of fact, no less – without having considered any of the evidence that supported Murphy's claim to relief. Under these circumstances, the state court's findings cannot even be considered "factual determinations." In an analogous situation, *Fahy* is instructive, if not controlling.  There, the capital defendant ostensibly waived his right to appellate and post-conviction review against the advice of his counsel. The trial court accepted that waiver without allowing the defense to make a record why the waiver was unknowing. On habeas review the validity of that waiver was a disputed issue, where the Third Circuit held that "when a state court's waiver colloquy fails to reveal whether the requirements of a valid waiver have been met due to procedural infirmities, substantive deficiencies, and an insufficient probing into a defendant's knowledge of the rights he is waiving, the findings by that court concerning the waiver are too unreliable to be considered "factual determinations." *Id*. at 183.  The state court's prejudice findings here are no less unreliable than in Fahy because the colloquy on which it based its decision also "fails to reveal" the facts necessary to determine whether Yacoubian's failings prejudiced Murphy.

**Conclusion**

For the foregoing reasons, petitioner Ameer Murphy, by his attorney Daniel Silverman, requests that the Court direct the Commonwealth to file a Response, allow Murphy time to file a Reply, direct that an evidentiary hearing be convened, and thereafter as to Claim I grant habeas relief in the form of a new trial and as to Claim II grant habeas relief with directions that the Commonwealth reinstate the original plea offer.

Respectfully,

**SILVERMAN & ASSOCIATES, P.C.**

BY:/s/ Daniel Silverman
        Daniel Silverman

**Certificate of Service**

I, Daniel Silverman, certify that I served via ECF the below-listed individual with a true and correct copy of the attached Supporting Memorandum of Law on the 3rd day of January, 2023:

Katherine Ernst, Esquire
Supervisor, Federal Litigation Unit
District Attorney's Office
3 South Penn Square
Philadelphia, PA 19107

**SILVERMAN & ASSOCIATES, P.C.**

BY: <u>/s/ Daniel Silverman</u>
Daniel Silverman, Esquire

I.D. No. 44335
The Widener Building - Suite 500
1339 Chestnut Street
Philadelphia, PA 19107
(215) 713-9146
SilvermanLaw@comcast.net