IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

AMEER MURPHY,
                Petitioner       :

     v.                             :      CIVIL ACTION
                                          No. 23-3970

JOHN RIVELLO, *et al.*         :
               Respondents

---

## PETITIONER'S AMENDED HABEAS PETITION RAISING ONE NEWLY-DISCOVERED CLAIM

Petitioner Ameer Murphy, by his attorney Daniel Silverman, submits this Amended Habeas Petition raising one legal claim supported by facts recently disclosed by the Commonwealth.

### Procedural History

On April 6, 2018, a jury presided over by the Honorable Barbara A. McDermott of the Philadelphia Court of Common Pleas found Ameer Murphy guilty of first-degree murder, conspiracy to commit first-degree murder and related weapons offenses. Judge McDermott immediately imposed the mandatory sentence of life imprisonment without parole on the murder count and concurrent terms of imprisonment on the remaining counts. Attorney George Yacoubian represented Murphy.

1

Murphy timely appealed. After the Superior Court was twice forced to dismiss the appeal because new counsel Todd Mosser twice failed to file a brief, on October 21, 2019 a panel of the Pennsylvania Superior Court issued an unpublished opinion affirming the judgment of sentence. *Commonwealth v. Murphy*, No. 1301 EDA 2018. On March 16, 2020, the Pennsylvania Supreme Court denied discretionary review without comment. *Commonwealth v. Murphy*, No. 570 EAL 2019. The one claim raised on direct appeal is not at issue in this federal habeas proceeding.

On June 9, 2021, Mosser filed a petition under the Post-Conviction Relief Act ("PCRA") raising one claim also not at issue in this federal habeas proceeding. Mosser labored under a conflict of interest in representing Murphy on both direct appeal and in PCRA proceedings because in PCRA proceedings Murphy had the right to allege Mosser's ineffective assistance as direct appeal counsel. On October 14, 2021, Judge McDermott dismissed the PCRA petition without a hearing. With Mosser still as counsel, Murphy timely appealed.

On October 20, 2021, a few days after Murphy's PCRA petition had been dismissed, the Pennsylvania Supreme Court issued its decision in *Commonwealth v. Aaron Bradley*, 261 A.3d 381 (Pa. 2021). *Bradley* for the first time granted PCRA petitioners like Murphy permission to allege on PCRA appeal that their PCRA counsel in Common Pleas PCRA proceedings had been ineffective in failing to identify meritorious claims. At Murphy's specific request, on April 14, 2022 Mosser

2

filed in Superior Court a Motion for Remand under the authority of *Bradley* requesting that new counsel be appointed to pursue two new claims that Mosser had failed to identify in the initial PCRA proceedings. Those two claims are the same two claims Murphy raised in his original petition for writ of habeas corpus (doc. 1) and briefed in his supporting memorandum of law (doc. 6) and accompanying exhibits (doc. 7). Murphy filed his counseled supporting memorandum of law on January 3, 2024, and no action has been taken on this case since then. Murphy hereby incorporates by reference the balance of the procedural history set forth in that memorandum of law.

On April 4, 2024, the Commonwealth mailed undersigned counsel four compact discs (CDs) containing various types of evidence. One of those CDs contains the March 31, 2015 videotaped police interview of Commonwealth trial eyewitness Norman Gay. This videotaped interview had never been disclosed until now. In that interview, Homicide Detective John Verrecchio (in the presence of Homicide Sergeant Robert Wilkins) confirmed with Gay that he had asked Gay to come to the police Homicide Unit to be interviewed following Gay's March 30, 2015 meeting with Homicide Detective Angela Gaines. At the meeting with Gaines, who herself was not connected to this homicide investigation, Gay viewed two photo arrays. He identified Murphy as the shorter of the two men he saw running past him with guns in their hands moments after shots had been fired. This was the first time

Gay had identified Murphy. At the conclusion of his March 31 interview with Gay (the day after Gay made this positive identification), Detective Verrecchio praised and thanked Gay for his cooperation, shook his hand and said, "Like I was telling you before, it's very rare we have people approach the police nowadays and give us *the correct information*." [See March 31, 2015 videotaped statement of Norman Gay, to be introduced as Amended Habeas Petition Exhibit A, at minutes 4:37 to 4:50 (emphasis added)]

For reasons discussed below, Detective Verrecchio's statement(s) to Gay before both the preliminary hearing and trial confirming that Gay had "correctly" identified Murphy violate(s) the Commonwealth's Fourteenth Amendment due process obligations to refrain from unduly suggesting to an eyewitness whom to identify under the *Stovall v. Denno*, 388 U.S. 293 (1967) line of cases. The Commonwealth's concealment of Detective Verrecchio's unnecessarily suggestive statements to Gay violates its Fourteenth Amendment due process disclosure obligations under *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny. These shall be combined as one claim herein and for ease referred to hereafter as "the *Brady* claim."

### Timeliness of this Habeas Petition

Habeas petitioners have one year from the date judgment of sentence becomes final to file their habeas petitions. 28 U.S.C. § 2244(d)(1). Murphy's original habeas

petition was timely, as we previously briefed. [*See* Supporting Memorandum of Law, 4-5]

Under 28 U.S.C. § 2244(d)(1)(D), the one-year statute of limitations for filing this claim "shall run from the latest of . . . the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." The Commonwealth disclosed the factual predicate of this claim on or about April 4, 2024, and Murphy is filing this amended petition on May 3, 2024, within the one-year period.

As trial counsel Yacoubian confirms, the Commonwealth failed to disclose the factual predicate for this claim before Murphy's trial. [*See* Supplemental Declaration of George Yacoubian, Esquire dated April 30, 2024, appended hereto as Amended Habeas Petition Exhibit B, ¶¶2-3] The Commonwealth did not disclose this evidence until April 4, 2024 when it mailed to undersigned counsel the CD containing the relevant footage. No greater due diligence on Murphy's part would have discovered these facts any sooner. Because the Fourteenth Amendment Due Process Clause required the Commonwealth to disclose this evidence before trial, as it was exculpatory and/or impeaching material information, Murphy and his attorney could reasonably assume, and therefore rely on the fact, that the Commonwealth would comply with its disclosure duties, where no additional diligence was required of them to discover this any sooner. The District Attorney's Office did not enact its

current open-file policy until sometime after the current District Attorney took office in January 2018. [*See* Amended Habeas Petition Exhibit B, ¶2] This included the files of both the District Attorney's Office and the Police Homicide Unit.

Due diligence means reasonable diligence; it does not mean extreme or excessive diligence of a sort that would prompt a lawyer to look under every rock without some case-related reason to do so. *See Munchinski v. Wilson*, 694 F.3d 308, 331 (3d Cir. 2012) ("the diligence inquiry is fact-specific and depends on the circumstances faced by the particular petitioner; there are no bright line rules as to what conduct is insufficient to constitute reasonable diligence. If a petitioner 'did what he reasonably thought was necessary to preserve his rights . . . based on information he received . . . , then he can hardly be faulted for not acting more 'diligently' than he did.'") (citation omitted); *Schlueter v. Varner*, 384 F.3d 69 (3d Cir. 2004) (applying the newly-discovered evidence exception to the federal time bar, court said that due diligence does not mean "maximum feasible diligence").

Therefore, merely because Murphy discovered this evidence now does not mean that Murphy and his prior counsel were not duly diligent before. When there is no reason to investigate something, the failure to investigate it cannot be faulted. When there is no reason, say, for a police detective to pursue a lead in a criminal investigation, his supervisor does not accuse him of lack of diligence. If he just so happens to go the extra mile and uncovers something useful, his supervisor may

congratulate him for his beyond-the-call-of-duty work, but only the most irrational of supervisors would have held him responsible for not pursuing that lead.

Any analysis of this issue must begin with the unremarkable principle that there is no generalized obligation for a pre-trial detainee or post-conviction inmate to investigate whether a detective confirmed for an eyewitness that his identification was correct. A prisoner may presume, given the due process requirements police and prosecutors are trained to follow, that the Commonwealth complied with those duties. Because the law imposes the duty on the Commonwealth to disclose this evidence, Murphy could assume no such impeaching evidence exists absent such disclosure. Although it may not necessarily have been difficult to obtain this evidence, the relative ease of doing so by itself imposes no actual duty to conduct that search to begin with and therefore does not mean that Murphy was not duly diligent. There was simply no case-specific reason to initiate that sort of an investigation. *See, e.g., Wilson v. Beard*, 426 F.3d 653, 661 (3d Cir. 2005) (rejecting state's argument that petitioner had not been duly diligent because the relevant information had been reported on the local news and was therefore of public record: "Absent some reasonable basis for concluding that the local news is likely to be a source of information at the particular time, due diligence does not require a prisoner in Wilson's position to monitor the news on a regular basis on the unlikely chance that he might learn something useful to his case"); *Roberts v. Dretke*, 356 F.3d 632,

638-39 (5th Cir. 2004) ("engaging in the time and labor intensive task of investigating the records of unrelated cases for evidence that, in almost all instances, will bear no relevant, much less useful, evidence, is beyond the requirements of due diligence"). The fact that the record was "easily obtainable" is therefore not the issue. Under these cases and basic logic, the question is whether there was good reason for Murphy to conclude that searching for a videotape he knew nothing about would *likely* turn up helpful information, and here there was no basis to believe that.[1]

In *Williams v. Taylor*, 529 U.S. 420 (2000), the Supreme Court reaffirmed that the focus in deciding whether the prisoner has been diligent in pursuing his claims is not on whether the facts could have been discovered, but on whether he was diligent. The question is whether the prisoner "made a reasonable attempt, in light of the information available at the time, to investigate and pursue claims in state court; it does not depend, as the Commonwealth would have it, upon whether those efforts could have been successful." *Williams*, 529 U.S. at 435.

There too was no reasonable basis for an investigation into whether an experienced homicide detective would intentionally or inadvertently congratulate a central eyewitness on getting his identification right before that witness ever

---

[1] The conditions of confinement are also a relevant factor in assessing due diligence. *Schlueter*, 384 F.3d at 75; *Moore v. Knight*, 368 F.3d 936, 939-40 (7th Cir. 2004) ("a due diligence inquiry should take into account that prisoners are limited by their physical confinement").

testified. Nothing in this case would have reasonably led anyone in Murphy's position to believe such an investigation was warranted. This is particularly true when considering that the Commonwealth had a duty to disclose this evidence but failed to do so.

In any event, the diligence analysis in this situation does not impose that high of a burden on counsel to sniff out what the state has concealed. *Banks v. Dretke*, 540 U.S. 668, 696 (2004) (a "rule thus declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process"). If the Commonwealth had disclosed this evidence to Murphy at any time – before or during trial, on direct appeal, at the state PCRA stage – Murphy could have exhausted this claim in state court. Any delay in filing cannot be attributed to Murphy.

For the foregoing reasons, Murphy's new claim is timely under 28 U.S.C. § 2244(d)(1)(D).


### Claim for Relief

**The Commonwealth's failure to disclose Detective Verrecchio's March 31, 2015 videotaped interview of eyewitness Norman Gay, in which he unnecessarily suggested to Gay that his identification of Murphy was "correct," violated the Due Process Clause of the Fourteenth Amendment and the dictates of *Brady v. Maryland* (1963).**

Detectives first interviewed Norman Gay on March 16, 2015, about two hours after the homicide. At that time, Gay said that sometime after 9:00 p.m. he was in

9

his living room watching television with his wife when he and his wife heard gunshots. He went to look out the front door, saw nothing, heard two more gunshots, and opened the front door and stepped out on his front porch. He saw two men run by him for about a second as his wife was trying to tug him back into the house. The men were each holding a gun with laser beams. He did not see the shooting and he did not recognize either of the two men who ran by him. He told police on the scene generally what he saw and was transported to Homicide that night to be interviewed by detectives. [N.T. 4/3/18, 93-102, 126]

Gay told the jury that one of the men he saw was 6'7" or 6'8" tall, the other was 6'4"-6'5" tall, and Murphy was the shorter of the two men. [*Id.* at 103-05] When he was first interviewed by detectives on the night of the murder, however, Gay described the shorter of the two men as 5'7" tall and the other man as 6' tall. [*Id.* at 130] About two weeks after the murder, on March 30, 2015, Gay viewed photo arrays and identified Murphy as one of the men he saw. [*Id.* at 96] Gay, however, also identified one Amir Grant, a different person, as the shorter of the two men he saw, when police confirmed that Grant could not have been involved. [*Id.* at 151-53]

On January 3, 2024, the Commonwealth emailed undersigned counsel a copy of the 935-page Homicide File, (known as the "H-file") which he completed reviewing on January 7, 2024. On January 10, 2024, undersigned counsel reviewed

the District Attorney's file on this case (known as the "DAO file") comprising four large boxes of materials. In the H-file were certain CDs that had to be separately ordered to make them available for review.

On April 4, 2024, over nine years after trial, the Commonwealth mailed undersigned counsel four CDs. One of them contained the March 31, 2015 videotaped interview of Gay by Detective Verrecchio where Sergeant Wilkins was present. This videotaped interview lasted 4 minutes and 50 seconds. In the interview, Detective Verrecchio confirms that Gay had viewed photo arrays the previous day, a procedure administered by Detective Angela Gaines, who had no affiliation with the murder case. Detective Verrecchio then selected one photograph from a pile of photographs (presumably the array from the previous day), showed that one photograph to Gay, and confirmed that Gay had identified that person as Murphy. The detective repeated that one-photograph procedure for the other suspect. These two photographs appear to be on 8.5 x 11-inch paper. Detective Verrecchio made reference to speaking with Gay on March 30, 2015 but this videotape does not confirm what was said between them at that time. At the very end of the March 31 interview, Detective Verrecchio shook Gay's hand and said, "Like I was telling you before, it's very rare we have people approach the police nowadays and give us *the correct information.*" [*See* Amended Habeas Petition Exhibit A, which when appropriate will be made available to the Court (emphasis added)]

11

By telling Gay that he had provided "correct information," Detective Verrecchio conveyed to Gay that his positive identification of Murphy comported with what the police had concluded from its own investigation. It strongly suggested to Gay that he picked "the right guy," which then fortified in Gay's mind that whatever doubts he may have had about his identification should be ignored. It hardened Gay's identification, making it more certain and positive. Confronted by his description to the police that Murphy was a below-average 5'7" tall while describing to the jury that Murphy was an NBA power forward-sized 6'6," – a dramatically stark inconsistency that by itself might establish enough reasonable doubt to secure one vote for acquittal -- Gay could now more confidently stick to his identification, knowing that even the police had concluded he was right all along. The same for his misidentification of Amir Grant as the other shooter.

Had the jury known that Detective Verrecchio had tainted Gay's identification in this manner, it is reasonably probable one or more jurors would have questioned the reliability of Gay's testimony. This demonstrates that the videotaped statement was material evidence.

To prove a due process violation under *Brady v. Maryland*, 373 U.S. 83 (1963), one must show that (1) the evidence at issue is favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the state, either willfully or inadvertently; and (3) prejudice

must have ensued. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). It is well-established that the *Brady* disclosure duty encompasses evidence that can be used to impeach the credibility of prosecution witnesses, *Giglio v. United States*, 405 U.S. 150, 154 (1972), or rebut factual assertions by the prosecution. *Haskins v. Superintendent Greene SCI*, 755 Fed.App'x 184, 189-90 (3d Cir. 2018) (concealed letter written by defense witness constitutes material *Brady* evidence because it would have rebutted Commonwealth argument that defense witness had recently fabricated his testimony).

Evidence is material under *Brady* when it could reasonably be taken to put the case in "such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995); *see also Banks v. Dretke*, 540 U.S. 668, 698-99 (2004) (materiality standard for *Brady* claims is met when favorable evidence could reasonably be taken to put case in such a different light as to undermine confidence in verdict). To show materiality, petitioners need not "demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Kyles*, 514 U.S. at 435. If there is "any reasonable likelihood" that the non-disclosure could have "affected the judgment of the jury," relief must be granted. *Napue v. Illinois*, 360 U.S. 264, 271 (1959); *Giglio*, 405 U.S. at 154. "The question is not whether [petitioners] would more likely than not have received a different verdict with the evidence, but whether

in its absence [they] received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 437.

Gay's identification of Murphy was challengeable even without the evidence of Detective Verrecchio's unlawful suggestions to him that he correctly identified the perpetrators. He made his observations at night, for a few seconds, as the young men, whom he did not know, ran past him. For a portion of those few seconds, he trained his eyes on their guns. His wife was tugging him back into the house during this time. His descriptions of the men's height were wildly inaccurate and inconsistent. And he once misidentified Amir Grant as one of the perpetrators, even going as far as to claim that Grant was the shorter of the two men, the one he told the jury was Murphy. Despite these problems, the trial prosecutor argued that Gay's identification of Murphy was reliable. [N.T. 4/5/18, 223-32 (Gay's identification of Murphy was corroborated by other evidence and was believable on its own)]

But just because Gay's testimony was impeached in other respects does not mean that this now-disclosed evidence of the March 31 videotape was not material. *See Lambert v. Beard*, 633 F.3d 126, 134-35 (3d Cir. 2011) ("it is patently unreasonable to presume—without explanation—that whenever a witness is impeached in one manner, any other impeachment becomes immaterial.") (citing

cases).[2] The videotaped interview with the challenged comments is not of a type with the impeachment Yacoubian conducted, where it might otherwise be characterized as simply corroborative. *Id.* (citing *Conley v. United States*, 415 F.3d 183, 189 (1st Cir. 2005) (cumulative similar impeachment evidence may not be material under *Brady*); *United States v. Boone,* 279 F.3d 163, 191 (3d Cir. 2002) (same) *Tankleff v. Senkowski,* 135 F.3d 235, 251 (2d Cir. 1998) (same). It is different. Armed with the videotaped evidence, Murphy could have litigated a pre-trial motion to suppress Gay's in-court identifications as the fruits of unnecessarily suggestive police conduct based on the factors set forth in *Neil v. Biggers,* 409 U.S. 188, 200 (1972), almost all of which – including Gay's limited opportunity to observe, Gay's misidentification of Grant, Gay's dramatically divergent height descriptions of the shooters -- militate in favor of suppression.

Even assuming Gay's testimony on this point would have survived that suppression motion, Murphy could nonetheless have explained to the jury why Gay's identification was not as reliable as he and the Commonwealth made it seem, an explanation that absent disclosure was unavailable to him. Murphy could have argued that the only reason Gay's identification appeared certain by the time of trial

---

[2] *Rev'd and remanded on other grounds sub nom. Wetzel v. Lambert*, 565 U.S. 520 (2012) (*per curiam*); on remand new trial granted again on same basis *sub nom. Lambert v. Beard,* 537 F. App'x. 78 (3d Cir. 2013) (non-precedential).

was because police planted the idea in his head that it was in fact correct. Murphy also could have attacked the police investigation by alleging that police were so desperate to implicate Murphy they stooped to unlawful, underhanded tactics to firm up what was otherwise a shaky witness. This new evidence thus represents a "significant difference" from the information Murphy possessed at trial. *See Slutzger v. Johnson*, 393 F.3d 373, 387 (3d Cir. 2004) (the distinction between the disclosed and undisclosed impeachment evidence was sufficient to warrant relief under *Brady* even though the witness's credibility was otherwise challenged).

---

Murphy shall promptly notify the Court whether he will be filing a successor PCRA petition to exhaust this claim. If so, he will file a Motion to Stay the federal proceedings pending exhaustion of that claim.

WHEREFORE, petitioner Ameer Murphy, by his attorney Daniel Silverman, requests that the Court issue an order directing the Commonwealth to file a response to both the original habeas petition (and supporting memorandum of law) and this amended habeas petition; set the matter down for an evidentiary hearing if needed; and thereafter to grant the petition for writ of habeas corpus.

Respectfully,

**SILVERMAN & ASSOCIATES, P.C.**

BY:/s/ Daniel Silverman
       Daniel Silverman

## Certificate of Service

I, Daniel Silverman, certify that I served via ECF the below-listed individual(s) with a true and correct copy of the attached Amended Habeas Petition on the 3rd day of May, 2024:

Katherine Ernst, Esquire
Supervisor, Federal Litigation Unit
District Attorney's Office
3 South Penn Square
Philadelphia, PA 19107

**SILVERMAN & ASSOCIATES, P.C.**

BY: /s/ Daniel Silverman
Daniel Silverman, Esquire

I.D. No. 44335
The Widener Building - Suite 500
1339 Chestnut Street
Philadelphia, PA 19107
(215) 713-9146
SilvermanLaw@comcast.net

# EXHIBIT A:

Videotape of Detective John Verrecchio's interview of Norman Gay

This shall be furnished to the Court at an appropriate time.

EXHIBIT B

**SUPPLEMENTAL DECLARATION OF GEORGE YACOUBIAN, ESQUIRE**

I, George Yacoubian, Esquire, do hereby swear and declare that the following is true and correct to the best of my knowledge, information and belief subject to the penalties for unsworn falsification to authorities set forth in 28 U.S.C. § 1746 and 18 Pa.C.S. § 4904.

1. I am an attorney licensed to practice in Pennsylvania. I was trial counsel for Ameer Murphy on his homicide trial before Judge Barbara McDermott in April 2018.

2. This homicide trial took place less than three months after District Attorney Larry Krasner took office. The current policy of the District Attorney's Office in making available both its files and the Homicide files for inspection and review by defense attorneys was not in effect during the time I represented Mr. Murphy. I therefore did not review either the District Attorney's file or the Homicide file; they simply were not available to me.

3. In addition, the Commonwealth never disclosed to me any videotaped interviews of eyewitness Norman Gay conducted by Philadelphia Police. On April 30, 2024, attorney Daniel Silverman advised me that there is a videotaped statement of Mr. Gay conducted on March 31, 2015 (about two weeks after the murder) by Philadelphia Homicide Detective John Verrecchio and Sergeant Robert Wilkins in which Detective Verrecchio told Mr. Gay, "Like I was telling you before, it's very rare we have people approach the police nowadays and give us the correct information." Assuming this is true, this was never disclosed to me. Assuming this is true, I am confident I would have used this information to impeach Mr. Gay's identification of my client and possibly attacked the integrity of the police investigation. At trial, I challenged Mr. Gay's identification as part of my overall strategy to undermine the Commonwealth' identification evidence. On the night of the incident, Mr. Gay did not recognize either of the two men who ran past him brandishing guns shortly after the shooting. His ability to observe these two men was

compromised by the facts that he only had a fleeting opportunity to see them, it was dark out, his wife was tugging him back into the house, he misidentified the other man, and he described my client as 6'5" – 6'6" tall when on the night in question he described him as 5'7" tall. It is wrong for a detective to tell an eyewitness before he testifies that he correctly identified the defendant, as this suggests to the eyewitness that police believe that the defendant is guilty and that they possess other evidence to implicate him. Such a statement hardens the eyewitness's identification and makes it less likely the eyewitness will admit that he did not get such a clear view of the suspects.


/s/ George S. Yacoubian, Jr.          4/30/24
George S. Yacoubian, Jr., Esquire     Date